LEVIN & CHETKOF, LLP
Michael G. Levin, Esq. (ML – 5441)
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
====================================X     Civil Action No.:  07-Cv-3646 (SCR)(MDF)

BENNIE WILLIS,

                      Plaintiff(s)          ***NOTICE OF MOTION***

    -against-

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

                      Defendant(s).

====================================X

       **PLEASE TAKE NOTICE** that upon the annexed affirmation of Michael G.

Levin, Esq., dated May 28, 2008, and the exhibits annexed thereto, the Affidavit of Richard

Rovegno sworn to on May 24, 2008 and the exhibits annexed thereto, and the Memorandum of

Law, defendants RICARD ROVEGNO and LAURA ROVEGNO will move this Court before

the Hon. Mark D. Fox, United States Magistrate Judge, S.D.N.Y. at the Courthouse located at

300 Quarropas Street, White Plains, New York on June 18, 2008 at 9:30 a.m., or as soon

thereafter for an order:

                (1)      pursuant to FRCP 55(c) and/or 60(b) vacating the Default Judgment dated

October 19, 2007 granting plaintiff's motion for a partial default on account of defendant's

failure to serve an answer;

(2)       permitting defendant to serve an answer in the form annexed to the

Rovegno Affidavit as Exhibit "E"; and

(3)       awarding such other and further relief as the Court deems just and proper;

and it is further

**LEVIN & CHETKOF, LLP**

By: _____

     **Michael G. Levin, Esq.** (MGL 5441)
Attorneys for Defendant Rovegno
265 Post Avenue - Suite 290
Westbury, New York 11590
(516) 338-2888
File No.:  GL 18050

To:     LAW OFFICE OF DIANE McFADIN
      Attorney for Plaintiff
      11 Broadway – Suite 715
      New York, New York 10004
      646-723-2757

      LOEB & LOEB, LLP
      Attorneys for Defendant
        Lawyers Title Insurance Corp.
      345 Park Avenue
      New York, New York 10154

      WILSON, ELSER, MOSCOWITZ,
        EDELMAN & DICKER, LLP
      Attorneys for Defendant Acranet
      150 E. 42nd Street
      New York, New York 10017
      212-490-3000

GL\ROVEGNO\GL 18050\LEGAL\NO-MO2VACATE

LEVIN & CHETKOF, LLP
Michael G. Levin, Esq. (ML – 5441)
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
====================================X    Civil Action No.:  07-Cv-3646 (SCR)(MDF)

BENNIE WILLIS,

                          Plaintiff(s)           ***ATTORNEY AFFIRMATION***
                                                 ***IN SUPPORT OF MOTION***

          -against-

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

                          Defendant(s).

====================================X

          **MICHAEL G. LEVIN**, an attorney duly admitted to practice within the State of

New York and the United States District Court for the Southern District, hereby affirms the

following upon information and belief under the penalties of perjury:

          1.       I am member in the Law Firm of LEVIN & CHETKOF, LLP, attorneys for

the Defendants RICHARD ROVEGNO and LAURA ROVEGNO (hereinafter collectively referred

to as the "ROVEGNO" defendants or the "ROVEGNOS") herein, and am fully familiar with the

facts and circumstances of this matter, based on the file maintained in our office and numerous

conversations and conferences with the Defendants.

          2.       This affirmation is submitted in support of defendants' motion to vacate the

partial default judgment pursuant to FRCP 55(c) and/or 60(b), along with the accompanying

529c31c31eb72195

Memorandum of Law.

3.      On October 19, 2007, plaintiff took a partial default judgment ordering defendants ROVEGNO to execute certain documents, including a TP-584 and RP-5217 (real property transfer documents) and to remove any and all liens and judgments assessed against real property located at 28 Terri Lane, New Hempstead, New York at their sole expense. A copy of the Partial Default Judgment is annexed to the Affirmation of Richard Rovegno (the "Rovegno Affidavit") as Exhibit "C." A copy of the plaintiff's summons and complaint is annexed hereto as Exhibit "A".

4.      As expressed in the accompanying Affidavit of RICHARD ROVEGNO, the default was precipitated by a many circumstances, including without limitation, not having counsel, the fire that burned down 28 Terri Lane, New Hempstead, New York, the ROVEGNOS' home, which destroyed virtually all of their possessions; the refusal of plaintiff WILLIS and his son-in-law, Terry Metheny (the "mortgage specialist and debt consolidator"), in violation of their representations, to provide content insurance for the ROVEGNOS; the breach of plaintiff WILLIS' agreement to option back to the ROVEGNOS their home; the lack of funds (caused by the fire and the "missing" $90,000 to $100,000 converted by Terry Metheny, acting, upon information and belief, in concert with plaintiff WILLIS, which sum was to be utilized to pay down the ROVEGNO defendant's debt, which was never done; the belief that they had been defrauded out of their home combined with their mistaken belief that any action would have to be commenced in Arkansas; their lack of sophistication and knowledge with respect to the nature of the action and their rights (see Exhibit "A"); and, the suggestions of counsel with whom the ROVEGNO defendants met, but could not afford to retain, who advised them not to re-execute any transfer documents due to the existence of the fraud claims with respect to the purported sale of their home.

5.      The ROVEGNOS possess neither the capacity nor sophistication to defend and/or prosecute a "mortgage rescue" fraud action, which, appears to be viable herein.

6.    As set forth more fully in the accompanying Rovegno Affidavit, the moving defendants' defenses and counter-claims have both merit and import to the within action. Indeed, the ROVEGNOS contend that the ultimate relief may be the voiding of the deed upon which the entire action is predicated. Consequently, the partial default judgment entered as against defendants ROVEGNO should be vacated so that all claims as and against all parties can be properly adjudicated on their merits.

7.    As stated by Mr. Rovegno in his accompanying Affidavit, the ROVEGNOS have suffered tremendously as a result of the fraud perpetrated upon them (leaving them with their prior debts, which were to have been discharged) and without a home or their material possessions due to a fire for which they were to insurance coverage. The moving defendants never intended to default in this action. It was their honest, good faith belief, that they could not, on their own, properly defend themselves and/or seek redress for the fraud they believe has been perpetrated upon them by Terry Metheny, and upon information and belief, plaintiff WILLIS.

8.    The fact is that until now, the ROVEGNO defendants were unable to retain counsel who could defend and prosecute their claims in what will likely be a complicated and time consuming matter. Your affirmant has only recently been retained and appeared by Notice of Appearance dated May 15, 2008 (annexed hereto as Exhibit "B").

9.    Based upon the foregoing, and the lack of prejudice to plaintiff herein, it is respectfully requested that the partial default entered as against the ROVEGNOS be vacated in its entirety, and that the proposed answer with counter-claims be accepted for filing by this Court (Rovegno Affidavit, Exhibit "E").

**WHEREFORE**, it is respectfully requested that this Court issue an order pursuant to FRCP 55(c) and/or 60(b)(6) vacating the default judgment and for such other and further relief as the court deems just and proper.

Dated: Westbury, New York

May 27, 2008

_____

MICHAEL G. LEVIN (ML-5441)

GL\ROVEGNO\GL 18050\LEGAL\ATTY-AFF MO2VACATE

**EXHIBIT A**

AO 440 (Rev. 10/93) Summons in a Civil Action -    JY WEB 4/99

# United States District Court

SOUTHERN _____ DISTRICT OF _NEW YORK_

BENNIE WILLIS,
            Plaintiff,

                    **SUMMONS IN A CIVIL CASE**

      V.

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES CO.,INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT SOLUTIONS, LLC,
d/b/a ACRANET LENDSERV, RICHARD ROVEGNO and
LAURA ROVEGNO,
               Defendants.

CASE NUMBER:

# 07 CIV. 3646

ROBINSON

TO: (Name and address of defendant)

| LANDAMERICA ONESTOP, INC. | ACRANET MORTGAGE | RICHARD ROVEGNO and |
|---|---|---|
| c/o Rick J. Preziosi | SETTLEMENT SOLUTIONS, LLC | LAURA ROVEGNO |
| (Registered Agent) | 113 Technology Dr. | (Address presently |
| 10 Bank Street, Suite 1120 | Pittsburgh, PA 15275 | unknown) |
| White Plains, New York 10606 | | |

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Kevin T. Mulhearn, P.C., 60 Dutch Hill Rd.,Suite 8
Orangeburg, New York 10962,

an answer to the complaint which is herewith served upon you, within ___thirty (30)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**J. MICHAEL McMAHON**

MAY 0 8 2007

_____
CLERK

_____
(BY) DEPUTY CLERK

DATE

AO 440  (Rev. 10/93)  Summons in a Civil Action -SDNY  WEB 4/99

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the defendant.  Place where served: _____
_____

☐   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐   Returned unexecuted: _____
_____
_____
_____

☐   Other *(specify):* _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing
information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                                   Date                                                        Signature of Server


_____
Address of Server

_____

(1)   As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

BENNIE WILLIS,

                                        Plaintiff,

                                                                    **COMPLAINT**

        - against - ·

                                                                    Docket No.
LANDAMERICA ONESTOP, INC., d/b/a/
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORPORATION,
ACRANET MORTGAGE SETTLEMENT                          **07 CIV. 3646**
SOLUTIONS, LLC, d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,
                                                                    **ROBINSON**
                                        Defendants.
-------------------------------------------------------------X

        Plaintiff, BENNIE WILLIS, complaining of the Defendants, LANDAMERICA

ONESTOP, INC., d/b/a/ LAWYERS TITLE SERVICES COMPANY, INC., and/or LAWYERS

TITLE INSURANCE CORPORATION, ACRANET MORTGAGE SETTLEMENT

SOLUTIONS, LLC, d/b/a ACRANET LENDSERV, RICHARD ROVEGNO and LAURA

ROVEGNO, by and through his attorneys, KEVIN T. MULHEARN, P.C., hereby alleges that:

                                        **P A R T I E S:**

    1.    Plaintiff, BENNIE WILLIS, is an individual who is, and at all material times has

          been, a citizen and resident of the State of Arkansas.

    2.    Defendant, LANDAMERICA ONESTOP, INC. ("LANDAMERICA"), is a

          corporation that is incorporated under the laws of the State of Virginia. At all

          material times, Defendant LANDAMERICA ONESTOP, INC., has conducted

          business in the State of New York, individually, and/or as and/or by and through

          its wholly owned subsidiaries and/or affiliates, LAWYERS TITLE SERVICES

COMPANY, INC. and/or LAWYERS TITLE INSURANCE CORPORATION. For the purposes of this Complaint, the designation LANDAMERICA shall be used interchangeably for each of the business entities named in this paragraph. Defendant LANDAMERICA may be served with process, pursuant to Rule 4(h)(l) of the Federal Rules of Civil Procedure, by serving its New York State registered agent, Rick J. Preziosi, at 10 Bank Street, Suite 1120, White Plains, New York 10606.

3.    Defendant, ACRANET MORTGAGE SETTLEMENT SOLUTIONS, LLC ("ACRANET"), is a limited liability corporation that, upon information and belief, is incorporated under the laws of the Commonwealth of Pennsylvania. Defendant ACRANET, upon information and belief, has a principal place of business in the Commonwealth of Pennsylvania, at 113 Technology Drive, Pittsburgh, Pennsylvania 15275.   At all material times, Defendant ACRANET has conducted business in or with respect to real property located within New York State individually, and/or as and/or by and through its wholly owned subsidiary or affiliate known as ACRANET LENDSERV.  For the purposes of this Complaint, the designation ACRANET shall be used interchangeably for each of the business entities named in this paragraph.

4.    Defendants, RICHARD ROVEGNO and LAURA ROVEGNO (the "ROVEGNO Defendants"), are individuals who, upon information and belief, are citizens and residents of the State of New York. Upon information and belief, they reside in the County of Rockland, State of New York.  Prior to May 5, 2006, said

Defendants, upon information and belief, were the sole and rightful owners, in fee

simple, of the real property located at 28 Terri Lee Lane, New Hempstead, New

York 10977 (the "subject premises").

## JURISDICTION AND VENUE:

5.    This Court has jurisdiction over this lawsuit under 28 U.S.C. §1332(a)(1) because

the Plaintiffs and Defendants are citizens of different states and the amount in

controversy exceeds the sum of $75,000.00, excluding interest and costs.

6.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a)(2) in that a

substantial part of the events or omissions giving rise to this action occurred in

this judicial district, and a substantial part of the property at issue (indeed, the

entirety of the real property at issue) is situated within this judicial district.

## FACTS:

7.    On April 21, 2006, Plaintiff and the ROVEGNO Defendants executed a written

contract whereby Plaintiffs agreed to purchase from the ROVEGNO Defendants

real property located at 28 Terri Lee Lane, New Hempstead, New York 10977

(the "subject premises"), for the agreed upon purchase price of $434,000.00.

8.    A copy of said contract is annexed hereto as Exhibit A and made a part hereof.

9.    In or about April, 2006, Plaintiff, through his mortgage company, Premium

Capital Funding, LLC, retained Defendant ACRANET, for the purpose of issuing

a policy of title insurance in favor of Plaintiff, as owner of the subject premises,

3

and a policy of title insurance in favor of Premium Capital Funding, LLC, as mortgagee of the subject premises..

10. Defendant ACRANET, then selected and used Defendant LANDAMERICA as title underwriter, and Defendant LANDAMERICA agreed to serve as title underwriter for the contemplated transaction.

11. Defendant LANDAMERICA, as title underwriter, assumed duties and responsibilities to, *inter alia*, oversee and supervise its title agent, Defendant ACRANET, with respect to obtaining and securing a bona fide Title Owner's Policy for Plaintiff for the subject premises; overseeing the proper execution, transfer, and recording of all necessary transfer documents for the subject premises, including the transfer deed, the TP-584, and RP-5217 forms, in compliance with New York law and procedure; and securing, if possible, good and marketable title for the subject premises in favor of Plaintiff.

12. Defendant, LANDAMERICA, is and at all material times has been authorized to conduct title underwriting services in the State of New York, and with respect to real property located within the State of New York.

13. Defendant ACRANET, and its agents, at all material times, acted with the authority, expressed or implied, of Defendant LANDAMERICA, as a designated title agent, in connection with the transaction at issue.

14. Accordingly, a contractual and fiduciary relationship was created between Plaintiff and Defendants LANDAMERICA and ACRANET, and said Defendants had an obligation to, at all material times, act in the best interests of Plaintiff, to

4

secure, if possible, good and marketable title for the subject premises, comply with New York law and procedures in connection with the transfer of New York real property and the delivery of good and marketable title therewith, and the recording of all necessary transfer documents in compliance with New York law and procedure.

15. Plaintiff promptly secured two written mortgage commitments in the total sum of $434,000.00 from Premium Capital Funding, LLC, and on May 5, 2006, Plaintiff was ready, willing and able to close on the purchase of the subject premises.

16. Defendants LANDAMERICA and ACRANET, by and though ACRANET's authorized representative, Roy Dale Adams, facilitated the closing of the transaction - in its capacity as title company - in Arkansas, on May 5, 2006. At all material times, Mr. Adams acted with the authority, expressed or implied, of both Defendants LANDAMERICA and ACRANET.

17. Plaintiff was not represented by counsel during this transaction, and, on several occasions, Plaintiff was informed by Defendant ACRANET's agent, Ms. Tricia Somerville, that Plaintiff did not need to retain an attorney to handle the real estate transaction, and that the title company was competent to handle all required transaction and document review (and oversight of execution of documents).

18. On May 5, 2006, a purported closing of the aforesaid real estate transaction occurred, as Mr. Adams met with Plaintiff at an office in Harrison, Arkansas (200 Highway 43 East, Suite 5) and purported to oversee the execution of all required documents.

5

19.    At said May 5, 2006 closing, Plaintiff executed a mortgage and all other required

loan documentation; as well as a HUD-1 Settlement Statement ( a true and

accurate copy of which is annexed hereto and made apart hereof as Exhibit B);

Plaintiff forwarded all required purchase sums to Defendant ACRANET, who in

turn disbursed all sums due and owing to the ROVEGNO Defendants.

Defendant ACRANET thereafter received a Warranty Deed (annexed hereto as

Exhibit C and made a part hereof) executed by the ROVEGNOS on May 5, 2006.

Said Warranty Deed was delivered to ACRANET only after said ROVEGNO

Defendants received full and complete consideration for the real property, subject

to the terms and conditions of the aforesaid contract of sale.

20.    At closing, all mortgage funds were tendered to Defendant ACRANET, and

Defendant ACRANET retained from those funds a fee in the amount of

$2,229.78, as and for Plaintiff's payment of the Basic Owner's Premium to

Defendant ACRANET.  Said payment is reflected on line 1306 [1307] of the aforesaid

HUD-1 Settlement Statement.

21.    At closing, Plaintiff was given a number of documents to sign by the Defendant

ACRANET, including a document (which is annexed hereto and made a part

hereof as Exhibit D), entitled "Waiver of Title Insurance (Owner's Policy)."

22.    The meaning and impact of this document was not conveyed to Plaintiff by

Defendants LANDAMERICA or ACRANET, or any of their agents, or any other

person.  Indeed, Plaintiff, at all material times, believed that he was paying for

and receiving a Title Owner's Policy from Defendants LANDAMERICA and

6

ACRANET.

23. To the extent that Plaintiff executed said waiver, it was executed under fraud, duress, coercion and/or undue influence.

24. Moreover, Defendants LANDAMERICA and ACRANET, by virtue of ACRANET's acceptance of the fee for said Owner's Policy, by their actions and/or omissions, evinced an acknowledgment that all parties understood and agreed that Plaintiff would be obtaining a Title Owner's Policy from said Defendants..

25. For all real property transferred in New York State, it is axiomatic that a County Clerk may not record a duly executed deed transferring said real property, unless and until said County Clerk simultaneously (at the time of the filing) records a fully executed RP-5217 (Real Property Transfer Report) and a fully executed TP-584 (Combined Real Estate Transfer Tax Return).

26. Title companies doing business with respect to real property located in New York State, such as Defendants LANDAMERICA and ACRANET, know, or should know, of this basic legal requirement.

27. Upon information and belief, however, at closing, Defendants LANDAMERICA and ACRANET, and their agents, failed to facilitate the execution of both the required RP-5217 and TP-584 forms.

28. Upon information and belief, Defendants LANDAMERICA and ACRANET, and their agents, were unable to properly file the aforesaid Warranty Deed after closing, because they did not have (and made no effort to obtain) the requisite

7

ancillary forms (i.e., RP-5217 and TP-584).

29.   Defendants LANDAMERICA and ACRANET, moreover, made no effort to cure

the blatant defects with respect to the aforesaid transfer documents, but rather

deliberately, maliciously and fraudulently, concealed those defects from Plaintiff

(after Defendants LANDAMERICA and ACRANET obtained actual or

constructive  knowledge of said defects).

30.   At or prior to closing, Plaintiff obtained from Foremost Insurance Company a

Homeowner's Insurance Policy which provided insurance for fire or other loss in

the sum of $434,000.00 (annexed hereto as Exhibit E and made apart hereof).

31.   On March 9, 2007, while the ROVEGNO Defendants were still residing at the

subject premises pursuant to a post-closing occupancy agreement between

Plaintiff and the ROVEGNO Defendants, the real property which Plaintiff had

purchased on May 5, 2006 (the "subject premises"), burned to the ground due to,

upon information and belief, faulty wiring.

32.   Immediately thereafter, Plaintiff filed a claim with said Foremost Insurance

Company for reimbursement of his loss (total loss of home).

33.   On March 12, 2007, Plaintiff was notified - for the first time - by Foremost

Insurance Company that Plaintiff's name was not on the deed of record and that

he therefore had no insurable interest in the property.

34.   On or about March 13, 2007, Plaintiff contacted Defendant ACRANET (and

spoke to Tricia Somerville) and informed them of the situation.

8

35.    Thereafter, on or about March 16, 2007, Plaintiff received a letter from Defendant
ACRANET (annexed hereto and made a part hereof as Exhibit F), which notified
Plaintiff that "the original [mortgage] is missing" and returned a clean mortgage
to Plaintiff for his execution.

36.    Plaintiff, on or about March 27, 2007, obtained a Binder Agreement executed by
Wales Corley Roseland Corp./Yehuda Frank (prospective purchaser), (annexed
hereto as Exhibit G) whereby the prospective purchaser offered to purchase (for
the sum of $275,000.00) the land at 28 Terri Lee Lane, New Hempstead, New
York, which was transferred to Plaintiff by the ROVEGNO Defendants on May 5,
2006.

37.    Plaintiff, however, solely as a result of the aforesaid title problems, which are
exclusively the fault of Defendants LANDAMERICA and ACRANET, cannot
obtain clean title to effectuate this land transfer, absent judicial intervention.

38.    Plaintiff continues to be obligated to make monthly mortgage payments (now, to
Chase) in the sum of $3,192.01 per month, for the subject premises, but cannot
obtain any use or enjoyment of said subject premises. Indeed, despite numerous
demands, the ROVEGNO Defendants continue to refuse to re-execute any and all
transfer documents with respect to the subject premises.

39.    Upon information and belief, Defendants, the ROVEGNOS, have had judgments
or liens assessed against them in the approximate sum of $56,000.00. As the
ROVEGNO Defendants are still showing to be record owners of the subject
premises, these judgments or liens are being assessed improperly against the

9

premises owned by Plaintiff.

## AS AND FOR A FIRST CLAIM

### NEGLIGENCE – AGAINST DEFENDANTS LANDAMERICA AND ACRANET

40. Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "39" herein, as of each has been fully set forth at length.

41. Defendants LANDAMERICA and ACRANET owed Plaintiff duties to conduct their title and underwriting businesses in an honest, reasonable and competent manner, and to protect the subject premises from any title defects and/or disputes as to good and marketable title, to promptly file with the Rockland County Clerk the May 5, 2006 deed transferring ownership to Plaintiff, to obtain, oversee the execution of, and then promptly record (with the deed) the ancillary transfer documents (i.e., TP- 584 and RP -5217),  to comply with New York law and procedure with respect to the transfer of real property in New York State and the recording of any and all documents necessary to effectuate said transfer, and to issue a bona fide and effective Owner's Title insurance policy in favor of Plaintiff for the subject premises..

42. Defendants LANDAMERICA and ACRANET breached said duties to Plaintiff by their aforesaid conduct, including but not limited to: failing to obtain (and oversee the execution of ) the necessary RP-5217 and TP-584 documents from the parties; failing to file the Warranty Deed in a timely manner; failing to file the mortgage in a timely manner; failing to notify Plaintiff of any and all defects, or potential title problems; failing to notify Plaintiff that the Deed had not been filed

10

in a timely manner; failing to attempt to cure any of the aforesaid deficiencies; failing to issue and/or obtain the requisite Title Owner's Policy (despite necessary full payment for same); failing to comply with New York law and procedure with respect to the transfer of real property located in New York State and the necessary recording of all transfer documents in connection therewith; and (for Defendant LANDAMERICA only) failing to select (and/or hire) and oversee a competent, honest and trustworthy title agent, and failing to properly supervise and oversee its title agent (ACRANET) with respect to all components of the transaction at issue and all of the aforesaid acts and/or omissions of ACRANET and/or its agents.

43.   Defendants LANDAMERICA and ACRANET's breaches of their aforesaid duties to Plaintiff were so egregious, gross and reckless, that they evince a reckless disregard and deliberate indifference to the rights and legal interests of Plaintiff, and may be deemed "willful and wanton."

44.   As a direct and proximate result of Defendants LANDAMERICA and ACRANET's aforesaid breaches of duty, Plaintiff has suffered severe and significant injuries, including but not limited to severe emotional distress and pain and suffering, the loss of the full value of the subject premises in a sum not less than $434,000.00, and the loss of an ability to sell the land at the subject premises for the sum of $275,000.00.

45.   Plaintiff, therefore, has suffered compensatory damages in a sum not less than $709,000.00, and, by virtue of Defendants LANDAMERICA and ACRANET's

11

aforesaid willful, wanton and reckless conduct, is entitled to receive punitive

damages from Defendants LANDAMERICA and ACRANET in a sum not less

than $2,000,000.00 ($2 million).

### AS AND FOR A SECOND CLAIM -- FRAUDULENT CONCEALMENT

### AGAINST DEFENDANTS LANDAMERICA AND ACRANET

46.    Plaintiff repeats and realleges each of the allegations contained in paragraphs "1"

through "45" herein, as of each has been fully set forth at length.

47. .    Defendants LANDAMERICA and ACRANET, and their agents, at all material

times, owed Plaintiff fiduciary obligations and had superior knowledge to that of

Plaintiff with respect to its their aforesaid required obligations to facilitate the

transfer of good and marketable title of the subject premises from the ROVEGNO

Defendants to Plaintiff, to conduct their title and underwriting businesses in an

honest, reasonable and competent manner,  to protect the subject premises from

any title defects and/or disputes as to good and marketable title,  to issue and/or

obtain the requisite Title Owner's Policy (especially after receiving the necessary

full payment for same from Plaintiff), to promptly file with the Rockland County

Clerk the deed transferring ownership to Plaintiff, to obtain, oversee the execution

of, and then promptly record (with the deed) the ancillary transfer documents

(i.e., TP- 584 and RP -5217), and to comply with New York law and procedure

with respect to the transfer of real property in New York State and the recording

of any and all documents necessary to effectuate said transfer.

12

48.     Defendants LANDAMERICA and ACRANET, likewise, by reason of their

        aforesaid fiduciary relationship and superior knowledge, had a duty to promptly

        warn and notify Plaintiff of his risk of loss due to the aforesaid failures of

        Defendants, and especially their failures to record the Warranty Deed and issue

        and/or obtain an Owner's Title Insurance Policy in favor of Plaintiff for the

        subject premises.

49.     Defendants, LANDAMERICA and ACRANET, and their agents, at all material

        times, deliberately, intentionally, willfully and wantonly concealed from Plaintiff,

        all facts and information related to their failures to promptly file and record the

        aforesaid Warranty Deed, to facilitate the execution and recording of the

        aforesaid TP584 and RP5217 forms, to secure an Owner's Title Insurance Policy

        (which Plaintiff paid for) in favor of Plaintiff for the subject premises, and to

        promptly notify Plaintiff of all of the aforesaid title deficiencies and/or title

        problems.

50.     Plaintiff relied to his considerable detriment and prejudice on Defendants

        LANDAMERICA and ACRANET's capability and willingness to conduct their

        title and underwriting duties and businesses with respect to Plaintiff in an honest,

        fair, competent and reasonable manner, to facilitate the transfer of good and

        marketable title of the subject premises from the ROVEGNO Defendants to

        Plaintiff, to protect the subject premises from any title defects and/or disputes as

        to good and marketable title,  to issue and/or obtain the requisite Title Owner's

        Policy (especially after receiving the necessary full payment for same from

13

Plaintiff), to promptly file with the Rockland County Clerk the deed transferring ownership to Plaintiff, to obtain, oversee the execution of, and then promptly record (with the deed) the ancillary transfer documents (i.e., TP- 584 and RP - 5217), and to comply with New York law and procedure with respect to the transfer of real property in New York State and the recording of any and all documents necessary to effectuate said transfer.

51.     As a direct and proximate result of the aforesaid wrongful and fraudulent concealment on the part of the Defendants, LANDAMERICA and ACRANET, and the aforesaid reliance of Plaintiff herein, Plaintiff is entitled to compensatory damage in a sum not less than $709,000.00 and punitive damages in a sum not less than $2,000,000.00 ($2 Million).

## AS AND FOR A THIRD CLAIM – VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 – AGAINST DEFENDANTS LANDAMERICA AND ACRANET

52.     Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "51" herein, as of each has been fully set forth at length.

53.     By reason of the foregoing, Defendants LANDAMERICA and ACRANET engaged in conduct with respect to the furnishing of title services in the State of New York that was deceptive and misleading in a practical way.

54.     Said deceptive and misleading conduct was "consumer-oriented" and caused consumer injury and harm to the public interest in that Defendants LANDAMERICA and ACRANET created a situation whereby the good and marketable title of the subject premises was impaired, and said premises may

14

therefore not be freely transferred pursuant to free and natural commerce in the real estate marketplace in New York State.

55.    Plaintiff has been specifically injured "by reason of" the aforesaid conduct of Defendants LANDAMERICA and ACRANET.

### AS AND FOR A FOURTH CLAIM

### SPECIFIC PERFORMANCE – AGAINST THE ROVEGNO DEFENDANTS

56.    Plaintiff repeats and realleges each of the allegations contained in paragraphs "1" through "57" herein, as of each has been fully set forth at length.

57.    With respect to the aforesaid April 21, 2006 contract of sale between Plaintiff and the ROVEGNO Defendants, Plaintiff performed each and every one of its contractual obligations, including but not limited to full payment of its purchase price ($434,000.00).

58.    The ROVEGNO Defendants therefore should be promptly compelled to perform all obligations needed to effectuate the transfer of good and marketable title to Plaintiff, as necessary, including but not limited to: (1) the re-execution of a Deed (with ancillary transfer documents (TP-584 and RP-5217) and prompt delivery of same to Plaintiff for filing and recording; and (2) the removal, at the ROVEGNO Defendants' sole expense, of any liens or judgments assessed against the subject premises, either pre-closing or post-closing.

WHEREFORE, based upon the aforesaid, Plaintiff respectfully requests that this Court issue an Order and Judgment in favor of Plaintiff and against Defendants, which shall provide:

15

1.     As and for the first claim (Negligence - against Defendants, LANDAMERICA and ACRANET) that a judgment be issued in favor of Plaintiff and against Defendants, LANDAMERICA and ACRANET, jointly and severally, in a sum not less than $709,000.00, as and for compensatory damages, and in a sum not less than $2,000,000.00 ($2 million), as and for punitive damages;

2.     As and for the second claim (Fraudulent Concealment - against Defendants, LANDAMERICA and ACRANET) that a judgment be issued in favor of Plaintiff and against Defendants LANDAMERICA and ACRANET, jointly and severally, in a sum not less than $709,000.00, as and for compensatory damages, and in a sum not less than $2,000,000.00 ($2 million), as and for punitive damages;

3.     As and for the third claim (violation of New York General Business Law §349 - against Defendants, LANDAMERICA and ACRANET) that a judgment be issued in favor of Plaintiff and against Defendants LANDAMERICA and ACRANET, jointly and severally, in a sum not less than $709,000.00, as and for compensatory damages, and in a sum not less than $2,000,000.00 ($2 million), as and for punitive damages; and that said Defendants be directed therein to pay Plaintiff's reasonable attorneys' fees, pursuant to New York General Business Law §349 (h);

4.     As and for a fourth claim (Specific Performance - against Defendants RICHARD ROVEGNO and LAURA ROVEGNO, that a judgment of specific performance, in the form of a judgment of law, a judgment of equity, or a judgment granting Plaintiff preliminary or permanent injunctive relief, or final relief, or a declaratory

16

judgment, be issued in favor of Plaintiff and against Defendants, RICHARD

ROVEGNO and LAURA ROVEGNO, jointly and severally, compelling said

Defendants to perform all obligations needed to effectuate the transfer of good

and marketable title to Plaintiff, as necessary, including but not limited to: (1) the

re-execution of a Deed (with ancillary transfer documents (TP-584 and RP-5217)

and prompt delivery of same to Plaintiff for filing and recording; and (2) the

removal, at said Defendants' sole expense, of any liens or judgments assessed

against the subject premises, either pre-closing or post-closing.

5.  That this Court award Plaintiff reasonable attorneys' fees and the costs and

disbursements of this action, and

6.  Grant Plaintiff any other, different, or further relief as to this Court may seem

just, proper or necessary.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 2, 2007
        Orangeburg, New York                    Respectfully submitted,

                                        KEVIN T. MULHEARN, P.C.

                                        By:  Kevin T. Mulhearn (KM 2301)
                                        Attorneys for Plaintiff
                                        60 Dutch Hill Road, Suite 8
                                        Orangeburg, New York 10962
                                        (845) 398-0361

17

# EXHIBIT B

LEVIN & CHETKOF, LLP
Michael G. Levin, Esq. (ML – 5441)
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

==============================X    Civil Action No.:  07 Civ. 3646 (SCR)

BENNIE WILLIS,

                    Plaintiff(s)          ***NOTICE OF APPEARANCE***

     -against-

LANDAMERICA ONESTOP, INC. d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE
CORPORATION, ACRANET MORTGAGE
SETTLEMENT SOLUTIONS, LLD, d/b/a
ACRANET LENDSERV, RICHARD ROVEGNO
and LAURA ROVEGNO

                    Defendant(s).

==============================X

    **PLEASE TAKE NOTICE THAT** LEVIN & CHETKOF, LLP, 265 Post Avenue, Suite

290, Westbury, New York 11590, hereby appears on behalf of defendants RICHARD

ROVEGNO and LAURA ROVEGNO in that above-captioned action, and demand that all papers

and notices be served upon them at the address stated below.

Dated: Westbury, New York
       May 14, 2008

                              LEVIN & CHETKOF, LLP

                              By: _____
                              **Michael G. Levin, Esq. (ML-5441)**
                              Attorneys for Defendants Rovegno
                              265 Post Avenue - Suite 290
                              Westbury, New York 11590

(516) 338-2888

File No.: GL 18050

To:   LAW OFFICE OF DIANE McFADIN
Attorney for Plaintiff
11 Broadway – Suite 715
New York, New York 10004
646-723-2757

LOEB & LOEB, LLP
Attorneys for Defendant
   Lawyers Title Insurance Corp.
345 Park Avenue
New York, New York 10154

WILSON, ELSER, MOSCOWITZ,
   EDELMAN & DICKER, LLP
Attorneys for Defendant Acranet
150 E. 42nd Street
New York, New York 10017
212-490-3000

GL\ROVEGNO\GL 18050\LEGAL\NOTICE OF APP.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

================================X    Civil Action No.:  07 Civ. 3646 (SCR)

BENNIE WILLIS,

                    Plaintiff(s)              **_CERTIFICATE OF SERVICE_**

        -against-

LANDAMERICA ONESTOP, INC. d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE
CORPORATION, ACRANET MORTGAGE
SETTLEMENT SOLUTIONS, LLD, d/b/a
ACRANET LENDSERV, RICHARD ROVEGNO
and LAURA ROVEGNO

                    Defendant(s).

================================X

        I hereby certify that on the 14th day of May 2008, I served a copy of the foregoing

Notice upon counsel for all parties by securely enclosing the aforesaid document in a postage

paid wrapper and placed in a post office box regularly maintained by the United States Postal

Service in Westbury, New York in said County of Nassau, directed to the following:

        LAW OFFICE OF DIANE McFADIN
        Attorney for Plaintiff
        11 Broadway – Suite 715
        New York, New York 10004

        LOEB & LOEB, LLP
        Attorneys for Defendant
            Lawyers Title Insurance Corp.
        345 Park Avenue
        New York, New York 10154

        WILSON, ELSER, MOSCOWITZ,
            EDELMAN & DICKER, LLP
        Attorneys for Defendant Acranet
        150 E. 42nd Street
        New York, New York 10017

Dated: Westbury, New York
      May 14, 2008

LEVIN & CHETKOF, LLP

By: _____
        **Michael G. Levin, Esq.** (MGL 5441)
Attorneys for Defendant Rovegno
265 Post Avenue - Suite 290
Westbury, New York 11590
(516) 338-2888
File No.: GL 18050

2

LEVIN & CHETKOF, LLP
Michael G. Levin, Esq. (ML – 5441)
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
═══════════════════════════════════X    Civil Action No.:  07-Cv-3646 (SCR)(MDF)

BENNIE WILLIS,

                    Plaintiff(s)         ***AFFIDAVIT IN***
                                         ***SUPPORT OF MOTION***

        -against-

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

                    Defendant(s).

═══════════════════════════════════X

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF ROCKLAND    )

        RICHARD ROVEGNO, being duly sworn, deposes and says:

        1.      I am one of the defendants in the above-captioned action.  As such, I am

personally familiar with the facts and circumstances set forth below, and submit this Affidavit in

support of RICHARD ROVEGNO and LAURA ROVEGNO'S (the "ROVEGNO" defendants),

to vacate their default for failing to answer.

**ROVEGNOS' Default Was Inadvertent**

        2.      I, along with my wife and co-defendant Laura, owned the property located

at 28 Terri Lee Lane, New Hempstead, New York, which is the property at the center of this action.

      3.     My wife and I purchased the home in December of 2000 while I was employed as a project manager in the IT Department at JP Morgan Chase.

      4.     Unfortunately, in 2005, I lost my job due to the looming recession and could not find work for more than a year. During that time, because I was unemployed, we fell behind in our mortgage payments and our mortgagee, Champion Mortgage, started to threaten foreclosure. We were both fiscally and emotionally distraught by this prospect.

      5.     During the troubled time, we started to receive unsolicited telephone calls from a man who identified himself a Terry Metheny, who represented that he was in the mortgage re-finance and debt consolidate business. I have no idea how Mr. Metheny got our phone number or information as to the status of our mortgage.

      6.     Mr. Metheny, who as it turns out is plaintiff's son-in-law, represented that he could help us avoid foreclosure and allow us to keep our home. While we had some trepidation, Mr. Metheny was very convincing and, being in such a troubled state, we were happy to receive any help. He told us that he was once down-and-out having suffered a broken back and did not want that to happen to anyone else. Unbeknownst to us, Terry Metheny had no intention of actually helping us.

      7.     Initially, Mr. Metheny represented that he would help us re-finance our existing mortgage and consolidate our debt, which had built-up during the time that I was unemployed. However, almost immediately, Mr. Metheny told us that he was unable to get us financing. He never produced any paperwork to that effect.

2

8.    Mr. Metheny then suggested that in an effort to "save" our home for us, we could sell the home to one of his relatives (plaintiff Bennie Willis), while continuing to live in the premises pursuant to a Residential Lease Purchase Option Agreement. Mr. Metheny suggested that his father-in-law lived in a trailer park in Arkansas. As it turned out, plaintiff Bennie Willis operated a mortgage and finance company and operated out of the same P.O. Box as his son-in-law in Western Grove, Arkansas. A copy of the Residential Lease Purchase Option Agreement is annexed hereto as Exhibit "A".

9.    Our agreement, with the knowledge of all parties, was that Laura and I would continue to live in our home paying "rent" for one year and then we would re-purchase it. Indeed, this was actually a mortgage, not a lease. This is confirmed by both the aforesaid Residential Lease Purchase Option Agreement and the e-mail of Terry Metheny dated May 4, 2006, the day before the "closing". In that e-mail, Mr. Metheny explicitly states "[m]ake sure you make copies of each payment on the note so that we can refinance it back into your name as soon as possible." A copy of the e-mail is annexed hereto as Exhibit "B".

10.    Moreover, the aforesaid e-mail confirms that Terry Metheny and/or his father-in-law, Bennie Willis, would supply "a full years worth of insurance" on our home and belongings. As it turns out, this representation was equally dubious.

11.    The "closing" took place on May 5, 2006. Neither I nor my wife was present at any closing. Terry Metheny and/or Bennie Willis purportedly attended the "closing" in Arkansas, despite the fact that the premises were located in New York. The documents relative to the transaction were, as far as I knew and was instructed, exchanged by mail/overnight courier. In fact, we never signed any New York State mandated transfer documents.

3

12.    At no time did either Terry Metheny or Bennie Willis advise us that Mr. Willis intended to live in our home. The whole purpose of the transaction as represented to us was to allow us to live in and keep our home.

13.    At the purported "closing", our prior mortgage was satisfied and an additional $90,000.00 to $100,000.00 (the exact amount is unknown because neither Mr. Metheny nor plaintiff Willis has provided the paperwork relative to same) was demanded and received by Mr. Metheny so that he could negotiate and pay-off our outstanding debts, including without limitation, property taxes.

14.    We subsequently learned that Terry Metheny never paid off our debts and instead, it appears that he converted our money for his and/or plaintiff's own use. Our demand for an accounting has to this day gone ignored and/or refused.

15.    During this time my wife and I continued to live in our home at 28 Terri Lee Lane, New Hempstead, New York, making monthly payments (mortgage) pursuant to the Residential Lease Purchase Option Agreement. See Exhibit "A".

16.    In March 2007, prior to the vesting of our buyback option, our home at 28 Terri Lee Lane, New Hempstead, New York suffered a massive fire that nearly destroyed the entire structure. Virtually all of our worldly possessions were destroyed in the fire and we were left homeless.

17.    We notified Mr. Metheny and plaintiff Willis of the fire so that we could file a claim under the insurance policy that they represented was in effect. While we understood that this would in no way make us whole, it would provide us with some solace and the ability, we hoped, of getting back on our feet.

4

18. However, it soon became clear that both Terry Metheny and plaintiff Willis had violated their agreement to provide us with insurance coverage or had misrepresented this fact in the first instance. We lost everything, while plaintiff Willis walked away with the insurance proceeds.

19. We had no money, no possessions and no place to live. We attempted to seek legal representation to assist us, but could not afford it. We were mistakenly under the impression that a lawsuit pursuant to the breach of the insurance coverage matter would have to be brought in Arkansas, and we could not afford to undertake any such prosecution at the time. Instead, it was a daily struggle just to get back on our feet.

20. Sometime after the fire, we were contacted to re-execute several documents relating to the purported "sale" of our home. Due to the fact that we were becoming enlightened to the fact that we had been defrauded by both Mr. Metheny and plaintiff Willis, we refused to do so. Counsel we had consulted at that time suggested just such an action. At that time our primary concern was to receive an accounting to determine where our $90,000.00 to $100,000.00 had disappeared, but that request was again ignored and/or refused.

21. When this action was commenced, neither my wife nor I could emotionally or financially handle the process. We were so disturbed by what had become of us --- the loss of our home; the loss of virtually all of our possessions; the loss of between $90,000.00 and $100,000.00; the refusal of anyone to help us --- we were paralyzed. We just wanted the nightmare to end. Unfortunately, plaintiff undertook to enter a default against us which is the subject of the instant motion. I do not recall having ever received any correspondence from plaintiff's counsel advising me of plaintiff's intent to move for a default. A copy of the Partial

5

Default Judgment dated October 19, 2007 is annexed hereto as Exhibit "C".

22.    In support of plaintiff's action, plaintiff Willis has relied upon a "Residential Lease". A copy of which is annexed hereto as Exhibit "D". Neither I nor my wife had ever seen this document prior to plaintiff's reliance upon it herein. We never signed such a document and we steadfastly believe that this is a manufactured document produced solely to advance plaintiff's tenuous position in this matter. The agreement we signed was the Residential Lease Purchase Option Agreement (See Exhibit "A"). Oddly, the signature lines are on a separate page that appears to have been merely lifted from the agreement we actually signed and attached to an agreement we had never seen before. Moreover, the efficacy of plaintiff's "Residential Lease" is belied by the Terry Metheny e-mail of May 4, 2007 (Exhibit "B").

23.    Neither I nor my wife's actions with respect to the default were willful or deliberate. Indeed, we did not know what to do. We were traumatized by our circumstances and the never ending cycle of troubles caused by our experience with Terry Metheny and Bennie Willis. We wanted to protect our rights but did not know how to do it since we did not possess the expertise or sophistication necessary.

## ROVEGNOS Have Numerous Meritorious Defenses

24.    In response to plaintiff's action, my wife and I have several viable meritorious defenses, any of which could render plaintiff's action completely baseless. These defenses include, inter alia, fraud in the inducement; forgery of closing documents/lease agreements; misrepresentation as to plaintiff's intention to comply with the buyback clause in the lease agreement; failure to procure insurance for our possessions while we were residing at 28 Terri Lee Lane, New Hempstead, New York after "closing"; conversion of our monies in the sum

6

of between $90,000.00 and $100,000.00, which sum was to be utilized to cover all property taxes and other debts; failure to provide an accounting; acting in concert with Terry Metheny to defraud us out of their home; upon information and belief, engaging in a mortgage rescue fraud scheme, which should result in the voiding of the deed; and failure to make out a prima facie claim as against us since we were fraudulently induced into entering into the contract of sale in the first place.

25.    As set forth above, the transaction was never intended to be an actual transfer of our interest in our home. Instead, it was represented by Mr. Metheny and his father-in-law, plaintiff Willis, that the deal would save our home for us. Mr. Metheny's and plaintiff's actions amounted to a material misrepresentation intended to induce us into executing certain documents.

26.    Everything that occurred thereafter, including the lack of insurance coverage, the manufactured lease agreement, the disappearance of approximately $90,000.00 to $100,000.00 of our money, the refusal to provide an accounting, and the failure to satisfy our outstanding debts, were merely undertaken in the furtherance of this scheme. Since plaintiff's action is predicated on an underlying fraud, it is defective on its face.

27.    Based on the foregoing, my wife and I assert that our default was neither willful nor deliberate; that we have several meritorious defenses, any of which could render plaintiff's action baseless; and that plaintiff would suffer no prejudice by allowing the vacatur. On the contrary, we would suffer immense prejudice resulting in the loss of our home, loss of all our possessions and loss of our money without any recourse. Annexed hereto as Exhibit "E" is a copy of our proposed Answer with Affirmative Defenses and Counter-Claims.

7

**WHEREFORE**, your deponent respectfully requests that RICHARD ROVEGNO

and LAURA ROVEGNO'S motion be, in all respects, granted.

_____
**RICHARD ROVEGNO**

Sworn to before me this
2 4 th day of May 2008

_____
Notary Public

WARREN COHEN
NOTARY PUBLIC, State of New York
No. 01CO4784063
Qualified in Rockland County
Commission Expires March 30, 20 11

8

**EXHIBIT A**

## Residential Lease Purchase Option Agreement

**Parties:**
This Agreement is entered into between **RICHARD ROVEGNO & LAURA ROVEGNO, husband and wife** (hereinafter referred to as "Tenants") and **BENNIE WILLIS** (hereinafter referred to as "Landlord"). Each Tenant is jointly and severally liable for the payment of rent and performance of all other terms of this Agreement. A judgment entered against one Tenant shall be no bar to an action against other Tenants.

**Premises:**
WITNESSETH: That in consideration of the representations made in the application filed by the Tenant with the Landlord, and the rent reserved herein and the covenants herein contained, the Landlord rents to Tenant, and Tenant rents from Landlord, for residential purposes only, the premises located at **28 TERRI LEE LN, NEW HEMPSTEAD, ROCKLAND COUNTY, NEW YORK 10977.**

**Term:**
The term of this Lease is a **MONTH TO MONTH** Agreement. Commencing on the **1st day of JUNE, 2006 and** expiring on the **Last Day** of each month. This Agreement renews each month when a payment is received on time or with in the 10 day grace period.

**Payment of Rent:**
The rent for the term of this agreement is $3,100.00 per month in advance, the first installment to be made on the **1st DAY OF JUNE, 2006.** And a like sum on the first day of every month thereafter, without setoff, deduction, or demand, except when that day falls on a weekend or a legal holiday, in which case rent is due on the next business day. Payment shall be made to the person and at the address the Landlord shall designate in writing. Rental is to be paid in cash, money order, cashier's check and\or certified check, or, at the option of the Landlord, in any other fashion. Rent shall not be considered paid until actual receipt thereof. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid.

Rent shall be made payable to and mailed or delivered to the following address:

**Bennie Willis**
**P.O. Box 83**
**Western Grove, AR 72685**

**Returned Check and Stop Payment:**
In each instance that a check offered by Tenant to Landlord for any amount due under this Agreement or in payment of rent is returned for lack of sufficient funds, a "stop payment" or any other reason, a service charge of $25.00, which does not exceed the maximum amount allowed by applicable New York law, will be assessed.

**Late Charges:**

If Tenant fails to pay the rent in full before the end of the 10th day after it's due, Tenant will be assessed a late charge of **$150.00** as allowed by applicable New York law. Landlord reserves and in no way waives the right to insist on payment of the rent in full on the date it is due.

## Purchase Option:

It is hereby agreed that Tenant shall have the option to purchase real estate located at: **28 TERRI LEE LN, NEW HEMPSTEAD, ROCKLAND COUNTY, NEW YORK 10977.**

- the purchase price will not exceed the amount required to payoff the liens on title
- this purchase option must be exercised in writing no later than **1st day of July, 2007**, but shall not be effective should the Tenant be in default under any terms of this lease or upon any termination of this lease.
- For Tenant to exercise this Purchase Option, Tenant agrees to notify Landlord in writing, sent via certified mail.
- If Tenant fails to exercise this Purchase Option in strict accord with the terms and conditions herein or within the time provided herein, Tenant agrees and acknowledges that the full consideration paid to Landlord shall be retained by Landlord as consideration for this purchase option and neither party shall have any further rights or claims against the other by reason of this Purchase Option.

**INITIALED: Tenant_____**

-If the Landlord fails to perform any of the covenants of this Purchase Option, the aforesaid money paid by the Tenant, at the option of the Tenant, shall be returned to the Tenant on demand; or the Tenant shall have only the right of specific performance.

**INTIALED: Landlord_____**

## Tenant Examination and Acceptance of Premises:

The Tenant acknowledges that he has examined the leased premises and his acceptance of this agreement is conclusive evidence that said premises are in good and satisfactory order and repair unless otherwise specified herein; and the Tenant agrees that no representations as to the condition of the premises have been made and that no agreement has been made to redecorate, repair or improve the premises unless hereinafter set forth specifically in writing. The Landlord will deliver the leased premises and all common areas in a habitable condition, pursuant to applicable state law. Tenant takes premises in its AS-is condition. Tenant agrees not to damage the premises through act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and\or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for nonpayment identical to those for nonpayment of rent described herein.

## Occupancy and Use:

The premises are to be used only as a private residence for Tenant(s) listed as parties of

the Agreement and the following minor children whose names and ages appear below:

The premises shall be occupied by no more than 7 persons, included children. The premises shall not be used for any purposes other than a private residence without the prior written consent of the Landlord.

**Disturbances and Violation of Laws:**
Tenant, guests and invitees of either tenant or guests shall not use the premises for any unlawful purpose and shall comply fully with all applicable federal, state and local laws and ordinances, including laws prohibiting the use, possession or sale of illegal drugs. Nor shall Tenant, guests and invitees of either tenant or guests use the premises in a manner offensive to others. Nor shall Tenant, guests and invitees of either tenant or guests create a nuisance by annoying, disturbing, inconveniencing or interfering with the quiet enjoyment of any other tenant or nearby resident. Tenant agrees to immediately inform Landlord and the appropriate authorities upon obtaining actual knowledge of any illegal acts on or upon the leased premises.

**Security Deposit and Return Thereof:**
Upon execution of this lease, Tenant will deposit with Landlord the sum of Ten Thousand Dollars ($10,000), which is to be held as collateral security and applied on any rent or any other charge that may remain due and owing at the expiration of this agreement, any extension thereof or holding over period or applied on any damages to the premises caused by the Tenant, his family, invitees, employees, trades people or pets, or other expenses suffered by Landlord as a result of a breach of any covenant of the Lease. Tenant may not utilize the security deposit as rent nor shall he deduct same from the last month's rent nor require the Landlord to indemnify itself from said sum of the money or any part thereof with respect to any particular violation or default of Tenant. In the event that any part of the said security deposit shall have been utilized by Landlord in accordance with the terms hereof or applicable law, the Tenant shall, upon the delivery notice of same, immediately deposit with the Landlord the amount so applied by Landlord so that the Landlord shall have the full deposit on hand at all times during the term of this lease and any renewal thereof or holding over. In the event of the sale of the property upon which this premises is situated or the transfer or assignment by the Landlord of this Lease, the Landlord shall have the right to transfer said security deposit to the transferee and Landlord shall be considered released from all liability for the return of the security deposit, and the Tenant shall look solely to the new Landlord for the return of his security deposit. It is agreed that the foregoing shall apply to every transfer or assignment made on the security deposit to a new Landlord.

Within two weeks, or the period of time required by State law, whichever occurs first, after the tenant has vacated the premises, Landlord shall furnish tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security and shall return any remaining portion of the security to the tenant.

Tenant is hereby notified, that unless otherwise provided by applicable State law, Landlord is not obligated to return Tenant's security deposit or give Tenant a written description of damages and charges until Tenant provides Landlord a written statement of Tenant's forwarding address for the purpose of refunding the security deposit. Tenant agrees that if such address is not produced within 14 days from the date of termination of the Lease, Tenant forfeit's the security deposit.

Tenant acknowledges that this paragraph constitutes written notice to him at time of payment of security deposit of his rights under applicable law.

**Application for Lease:**
Tenant acknowledges that the statements and representations made in the signed application for said premises are true, that they are deemed a part of this Lease, and the falsity of any of them shall constitute a breach hereof.

**Possession At Commencement of Term:**
Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises to Tenant on or before the commencement of the term of this Lease due to another person occupying the premises, Tenant's rights of possession hereunder shall be postponed until said premises are vacated by such other person, and rent due hereunder shall be abated at the rate of one-thirtieth (1/30) of a monthly installment for each day that possession is postponed. Tenant expressly agrees that Landlord shall not be liable for damages to Tenant in the event Tenant, for any reason whatsoever, is unable to enter and occupy the premises.

**Insurance:**
Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and/or guests for damages not caused y Landlord or Landlord's agents. Landlord will not compensate Tenant or anyone else for damages caused by any other source whatsoever, or by Acts of God, and Tenant is therefore must independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and/or guests, and all personal property on the leased premises and/or in any common areas from any and all damages.

**Utilities:**
Tenant will be responsible and pay for all utilities (gas, water, electric, refuse collection, telephone, cable or satellite TV), including all required deposits.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.

**Alterations and Repairs by Tenant:**

Unless authorized by law, Tenant will not, without Landlord's prior written consent, alter, re-key or install any locks to the premises or install or alter any burglar alarm system. Tenant will not remodel or make any structural changes, alterations or additions to the premises, will not paper, paint or decorated, nor install, attach, remove or exchange appliances or equipment such as air conditioning, heating, refrigerating or cooking units, radio or television antennae; not drive nails or other devices into the walls or woodwork (a reasonable number of picture hangers excepted), nor refinish or shellac wood floors, nor change the existing locks of the premises, without the prior written permission of the Landlord or his Agent. Any of the above-described work shall become part of the dwelling.

## Assignment of Agreement and Subletting:
Tenant will not sublet the premises or any portion thereof, or assign this Lease without the prior written consent of Landlord.

## Surrender of Premises:
Tenant will, upon termination of this Lease, surrender the premises and all fixtures and equipment of Landlord therein in good, clean and operating condition, ordinary wear and tear excepted. Tenant shall, at time of vacating premises, clean said premises including stove and refrigerator and remove trash from the premises. Upon vacating the premises Tenant shall deliver all keys thereto to the Landlord or his Agent within twenty-four (24) hours after vacating. Failure to comply will be cause to charge Tenant for changing locks.

## Landlord's Right to Access and Inspection:
In addition to the rights provided by applicable state law, in the event of an emergency, to make repairs or improvements or to show the premises to prospective buyers or tenants or to conduct an annual inspection or to address a safety or maintenance problem or to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease, Landlord or Landlord's duly authorized agents may enter the premises. Except in cases of emergency, Tenant's abandonment of the premises, court order or where it is impractical to do so, Landlord shall give Tenant reasonable notice before entering. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

## Termination of Lease - Hold Over:
Either Landlord or Tenant may terminate this lease at the expiration of said Lease or any extension thereof by giving the other thirty (30) days written notice prior to the due date. If Tenant shall hold over after the expiration of the term of this Lease, Tenant shall, in the absence of any written agreement to the contrary, be a tenant from month to month, as defined by applicable state law, at the monthly rate in effect during the last month of the expiring term. All other terms and provisions of this Lease shall remain in full force and effect.

In the event Tenant becomes a month-to-month tenant in the manner described above,

Tenant shall be required to provide Landlord, in advance, thirty (30) days written notice of Tenant's intention to surrender the Premises. Landlord, at Landlord's discretion, at any time during a month-to-month tenancy, may terminate the month-to-month tenancy or lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable state law. Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

**Extended Absences by Tenant and Notice Thereof:**
Tenant will notify Landlord in advance if Tenant will be away from the premises for seven (7) or more consecutive days. During such absence, Landlord may enter the premises at times reasonable necessary to maintain the property and inspect for needed repairs. If such absences are customary and frequent, the expected frequency and duration of absence should be summarized here:

**Abandonment:**
Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any monies owing remain unpaid. In such event, Tenant will be considered in default of this Lease. This definition is subordinate to, and shall not in any way impair, the rights and remedies of Landlord under this Lease and/or applicable state law, except in the case of abandonment, Landlord or Landlord's agents may immediately or any time thereafter enter and re-take the leased premises as provided by applicable state law, and terminate this Lease without notice to Tenant.

**Property Damage - Destruction of Property:**
If the premises are rendered totally unfit for occupancy by fire, act of God, act of rioters or public enemies, or accident, the term of this Lease shall immediately cease upon the payment of rent apportioned to the day of such happening. If, however, the premises are only partially destroyed or damaged and Landlord decides to repair the same, such repairs shall be made by Landlord without unreasonable delay, and there shall be abatement in rent in proportion to the relationship the damaged portion of the leased premises bears to the whole of said premises. Tenant, Tenant's guests and invitees of either Tenant or Tenant's guests will not engage in any activity or action that may cause severe property damage.

**Hold Harmless:**
To the fullest extent permitted by applicable state law, Landlord and his Agent will be held free and harmless from any and all loss, claim or damage by reason of any accident, injury, or damage to any person or property occurring on or about the leased premises, unless such accident, injury, or damage shall be caused by the negligence of the Landlord, its agents, servants and/or employees.

**Default / Breach By Tenant:**
In the event of any default hereunder on the part of the Tenant, his family, servant, guests, invitees, or should the Tenant occupy the subject premises in violation of any

lawful rule, regulation or ordinance issued or promulgated by the Landlord or any rental authority, then and in any of said events the Landlord shall have the right to terminate this lease by giving the Tenant personally or by leaving at the leased premises a thirty (30) day written notice of termination and the Lease shall terminate upon the expiration of (30) days from the delivery of such notice if the default is not remedied within a reasonable time not in excess of thirty (30) days and the Landlord, at the expiration of said thirty (30) day notice or any shorter period conferred under or by operation of law, shall thereupon be entitled to immediate possession of said premises and may avail himself of any remedy provided by law for the restitution of possession and the recovery of delinquent rent. If this Lease is terminated, Landlord shall return all prepaid and unearned rent, and any amount of the security deposit recoverable by the Tenant.

However, in the event the default is nonpayment of rent, Landlord shall not be required to deliver thirty (30) days notice as provided above but may serve Tenant with a seven (7) day written notice of termination whereupon the Tenant must pay the unpaid rent in full or surrender the premises by the expiration of the seven (7) day notice period. Furthermore, for any substantial violation of this Lease or applicable law materially affecting health and safety, Landlord may serve Tenant with a three (3) day written notice of termination whereupon the Tenant must cure the default by the expiration of the three (3) day notice period or surrender the premises. Upon Landlord's termination of this, Tenant expressly agrees and understands that unless prohibited by applicable state law, the entire remaining balance of unpaid rent for the remaining term of this Lease shall ACCELERATE, whereby the entire sum shall become immediately due, payable, and collectible. Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**Remedies - Cumulative:**
The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable state law.

**Waiver:**
Any waiver of a default hereunder shall not be deemed a waiver of this agreement or this agreement or of any subsequent default. Acquiescence in a default shall not operate as a waiver of such default, even though such acquiescence continues for an extended period of time.

**Grounds for Termination of Tenancy:**
The failure of Tenant, guests and invitees of either tenant or guests to comply with any term of this Lease is grounds for termination of the tenancy, with appropriate notice to Tenant and procedures as required by law.

**Court Costs and Attorneys Fees:**
In the event that the Landlord shall find it necessary to expend any monies in legally enforcing any provisions of this lease, including the collection of rent or other charges due hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and

costs incurred thereby, to the greatest extent allowed by applicable law.

**Agents and Authority to Receive Legal Papers:**
Any notice which either party may or is required to give, shall be in writing and may be given by mailing the same, by certified mail, and shall be deemed sufficiently served upon Tenant if and when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox to Tenant at the premises. If Tenant is more than one person, then notice to one shall be sufficient as notice to all. The Landlord, any person managing the premises and anyone designated by the Landlord as agent are authorized to accept service of process and receive other notices and demands, which may be delivered to:

> Bennie Willis
> P.O. Box 83
> Western Grove, AR  72685

**Time:**
Time is of the essence of this agreement.

**Subordination:**
Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any documents related to the Landlord's right to subject the premises to a mortgage or other lien.

**Eminent Domain:**
If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Tenant's use of the premise, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent shall be apportioned as of the termination date, and any rent paid for the period beyond that date shall be repaid to Tenant. Tenant shall not be entitled to any part of the award for such taking or any payment in lieu thereof.

**Paragraph Headings:**
The headings of particular paragraphs and subparagraphs are inserted only for convenience and are not part of this Agreement and are not to act as a limitation on the scope of the particular paragraph to which the heading refers.

**Binding:**
This Lease shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.

**Entire Agreement:**
This document and any Attachments constitutes the final and entire Agreement between the parties hereto, and not promises or representations, other than those contained here

and those implied by law, have been made by Landlord or Tenant. Neither Landlord or Tenant shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained unless made in writing and signed by both Landlord and Tenant.

**Governing Law:**
This Lease shall be governed by the laws of the state of New York.

**Severability:**
The provisions of this Lease are severable and in the event any provision, clause, sentence, section or part thereof is held to be invalid, illegal, unconstitutional, inapplicable or unenforceability shall not affect or impair any of the remaining provisions, sentences, clauses, sections, parts of the lease or their application to Tenant or other persons or circumstances. It is understood and agreed that the terms, conditions and covenants of this Lease would have been made by both parties if such invalid, illegal, unconstitutional, inapplicable or unenforceable provision, sentence, clause, section or part had not been included therein to the extent that portion of this agreement may be invalid by striking of certain words or phrases, such words or phrases shall be deemed to be stricken and the remainder of the provisions and the remainder of the other portions of this Lease agreement shall remain in full force and effect. It is further agreed that this Lease may be executed in counterparts, each of which when considered together shall constitute the original contract.

**Additional Provisions:**

**Tenant acknowledges receipt of an executed copy of this Lease.**

Landlord/Agent's signature_____

Title:_____

Date:_____

Address:_____

Phone:_____

Witness to Landlord's Signature_____
Print Name:_____ Date:_____

Tenant's Signature:_____
Print Name:_____ Date:_____

Tenant's Signature:_____
Print Name:_____ Date:_____

# EXHIBIT B

| Inbox | New | Reply | Reply all | Forward | Delete | Junk |
|---|---|---|---|---|---|---|

Junk
Drafts

Move to ▾    Options ❓

Sent
Deleted

## Lease & Checks

angels
family
jokes

From: **Terry Metheny** (terrymetheny34@yahoo.com)
Sent: Thu 5/04/06 1:32 PM
To: jrovegno@hotmail.com
Cc: ljrovegno@hotmail.com

Oldstuff

📎 LEASE.wps (65.1 KB), Checks.wps (14.5 KB)    Security scan upon download 🦅 TREND

trip
Yvonne

Hey guys,

Manage folders

Here is the final lease with final numbers and 100% accurate.

Today
Mail

We had to split the mortgage into two loans both due on the first. Payments are
$2,398.02
$793.99
Total: $3,192.01

Contacts
Calendar


send some
awesome
mail

This number does not include taxes or insurance. I did not put them in escrow. We are paying a full years worth of insurance and taxes which between back taxes and taxes now due along with insurance come out to $16,400.

Once funds are available in my account I will wire the $5,000 to you asap. They will be overnighting the package today and once you get it sign and notorize the papers and send it right back and then the loan will fund either monday or tuesday.

Make sure that you make copies of each payment on the note so that we can refinance it back into your name as soon as possible. Please keep in mind when you do this all you will owe is the payoffs and if you choose to sale the home before you refinance it then 100% of the difference will be given to you.

If you have any questions please call me.

Want to race through your inbox even faster? Try the full version of Windows Live Hotmail. (It's free, too.)

© 2008 Microsoft | Privacy | Legal    Help Central | Account | Feedback

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BENNIE WILLIS,

                              Plaintiff,                    07-CV-3646 (SCR)

        - against -

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY INC.,           **PARTIAL DEFAULT**
and/or LAWYERS TITLE INSURANCE                 **JUDGMENT AGAINST**
CORPORATION, ACRANET MORTGAGE                  **DEFENDANTS RICHARD**
SETTLEMENT SOLUTIONS, LLC, d/b/a               **AND LAURA ROVEGNO**
ACRANET LENDSERV, RICHARD ROVEGNO
and LAURA ROVEGNO,

                              Defendants.
-------------------------------------------------------X

        This action, having been duly commenced by filing the Summons and Complaint, and a

copy of the Summons and Complaint having been duly served on defendants Richard Rovegno

and Laura Rovegno (the "Rovegno Defendants"), and said Rovegno Defendants, having failed to

plead or otherwise defend in this action, and said default having been duly noted, and upon the

annexed affidavit in support of partial default judgment, pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure, it is

        ORDERED, ADJUDGED AND DECREED: That the Rovegno Defendants, residing at

409 Old Route 202-C, Suffern, New York, are ordered to execute the required ancillary

documents TP-584 and RP-5217 and promptly deliver the same to Plaintiff and to remove any

and all liens and judgments assessed against the real property located at 28 Terri Lee Lane, New

Hempstead, New York at the sole expense of the Rovegno Defendants, pursuant to Rule 54(b) of

the Federal Rules of Civil Procedure.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

Dated: White Plains, New York

October ___19___, 2007

SO ORDERED:

By: _____

Hon. Stephen C. Robinson, U.S.D.J.

This document was
entered on the docket on

_____

2

**EXHIBIT D**





## Residential Lease

**Parties:**
This Agreement is entered into between **RICHARD ROVEGNO & LAURA ROVEGNO, husband and wife** (hereinafter referred to as "Tenants") and **BENNIE WILLIS** (hereinafter referred to as "Landlord"). Each Tenant is jointly and severally liable for the payment of rent and performance of all other terms of this Agreement. A judgment entered against one Tenant shall be no bar to an action against other Tenants.

**Premises:**
WITNESSETH: That in consideration of the representations made in the application filed by the Tenant with the Landlord, and the rent reserved herein and the covenants herein contained, the Landlord rents to Tenant, and Tenant rents from Landlord, for residential purposes only, the premises located at **28 TERRI LEE LN, NEW HEMPSTEAD, ROCKLAND COUNTY, NEW YORK 10977.**

**Term:**
The term of this Lease is a **MONTH TO MONTH** Agreement. Commencing on the 1st day of **JUNE, 2006** and expiring on the **Last Day** of each month. This Agreement renews each month when a payment is received on time or with in the 10 day grace period.

**Payment of Rent:**
The rent for the term of this agreement is $3,192.01 per month in advance, the first installment to be made on the 1st **DAY OF JUNE, 2006.** And a like sum on the first day of every month thereafter, without setoff, deduction, or demand, except when that day falls on a weekend or a legal holiday, in which case rent is due on the next business day. Payment shall be made to the person and at the address the Landlord shall designate in writing. Rent is to be paid in cash, money order, cashier's check and\or certified check, or, at the option of the Landlord, in any other fashion. Rent shall not be considered paid until actual receipt thereof. Tenant placing rent monies in the mail is not sufficient for rent to be considered paid.

Rent shall be made payable to and mailed or delivered to the following address:

Bennie Willis
P.O. Box 83
Western Grove, AR 72685

**Returned Check and Stop Payment:**
In each instance that a check offered by Tenant to Landlord for any amount due under this Agreement or in payment of rent is returned for lack of sufficient funds, a "stop payment" or any other reason, a service charge of $25.00, which does not exceed the maximum amount allowed by applicable New York law, will be assessed.

**Late Charges:**
If Tenant fails to pay the rent in full before the end of the 10th day after it's due, Tenant will be assessed a late charge of **$150.00** as allowed by applicable New York law. Landlord reserves and in no way waives the right to insist on payment of the rent in full on the date it is due.

**Tenant Examination and Acceptance of Premises:**
The Tenant acknowledges that he has examined the leased premises and his acceptance of this agreement is conclusive evidence that said premises are in good and satisfactory order and repair unless otherwise specified herein; and the Tenant agrees that no representations as to the condition of the premises have been made and that no agreement has been made to redecorate, repair or improve the premises unless hereinafter set forth specifically in writing. The Landlord will deliver the leased premises and all common areas in a habitable condition, pursuant to applicable state law. Tenant takes premises in its AS-is condition. Tenant agrees not to damage the premises through act or omission, and to be responsible for any damages sustained through the acts or omissions of Tenant, Tenant's family or Tenant's invitees, licensees, and\or guests. If such damages are incurred, Tenant is required to pay for any resulting repairs at the same time and in addition to the next month's rent payment, with consequences for nonpayment identical to those for nonpayment of rent described herein.

**Occupancy and Use:**
The premises are to be used only as a private residence for Tenant(s) listed as parties of the Agreement and the following minor children whose names and ages appear below:

The premises shall be occupied by no more than 7 persons, included children. The premises shall not be used for any purposes other than a private residence without the prior written consent of the Landlord.

**Disturbances and Violation of Laws:**
Tenant, guests and invitees of either tenant or guests shall not use the premises for any unlawful purpose and shall comply fully with all applicable federal, state and local laws and ordinances, including laws prohibiting the use, possession or sale of illegal drugs. Nor shall Tenant, guests and invitees of either tenant or guests use the premises in a manner offensive to others. Nor shall Tenant, guests and invitees of either tenant or guests create a nuisance by annoying, disturbing, inconveniencing or interfering with the quiet enjoyment of any other tenant or nearby resident. Tenant agrees to immediately inform Landlord and the appropriate authorities upon obtaining actual knowledge of any illegal acts on or upon the leased premises.

**Security Deposit and Return Thereof:**
Upon execution of this lease, Tenant will deposit with Landlord the sum of Ten Thousand

Dollars ($10,000), which is to be held as collateral security and applied on any rent or any other charge that may remain due and owing at the expiration of this agreement, any extension thereof or holding over period or applied on any damages to the premises caused by the Tenant, his family, invitees, employees, trades, people or pets, or other expenses suffered by Landlord as a result of a breach of any covenant of the Lease. Tenant may not utilize the security deposit as rent nor shall he deduct same from the last month's rent nor require the Landlord to indemnify itself from said sum of the money or any part thereof with respect to any particular violation or default of Tenant. In the event that any part of the said security deposit shall have been utilized by the Landlord in accordance with the terms hereof or applicable law, the Tenant shall, upon the delivery notice of same, immediately deposit with the Landlord the amount so applied by Landlord so that Landlord shall have the full deposit on hand at all times during the term of this lease and any renewal thereof or holding over. In the event of the sale of the property upon which this premises is situated or the transfer or assignment by the Landlord of this Lease, the Landlord shall have the right to transfer said security deposit to the transferee and Landlord shall be considered released from all liability for the return of the security deposit. It is agreed that the foregoing shall apply to every transfer or assignment made on the security deposit to a new Landlord.

Within two weeks, or the period of time required by State law, whichever occurs first, after the tenant has vacated the premises, Landlord shall furnish tenant, by personal delivery or by first-class mail, postage prepaid, a copy of an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security and shall return any remaining portion of the security to the tenant.

Tenant is hereby notified, that unless otherwise provided by applicable State law, Landlord is not obligated to return Tenant's security deposit or give Tenant a written description of damages and charges until Tenant provides Landlord a written statement of Tenant's forwarding address for the purpose of refunding the security deposit. Tenant agrees that if such address is not produced within 14 days from the date of termination of the Lease, Tenant forfeit's the security deposit.

Tenant acknowledges that this paragraph constitutes written notice to him at time of payment of security deposit of his rights under applicable law.

**Application for Lease:**
Tenant acknowledges that the statements and representations made in the signed application for said premises are true, that they are deemed a part of this Lease, and the falsity of any of them shall constitute a breach hereof.

**Possession At Commencement of Term:**
Tenant shall not be entitled to possession of the premises designated for lease until the security deposit and first month's rent (or prorated portion thereof), less any applicable promotional discount, is paid in full and the premises to Tenant on or before the commencement of the term of this Lease due to another person occupying the premises,

Tenant's rights of possession hereunder shall be postponed until said premises are vacated by such other person, and rent due hereunder shall be abated at the rate of one-thirtieth (1\30) of a monthly installment for each day that possession is postponed. Tenant expressly agrees that Landlord shall not be liable for damages to Tenant in the event Tenant, for any reason whatsoever, is unable to enter and occupy the premises.

**Insurance:**
Landlord shall not be liable to Tenant, Tenant's family or Tenant's invitees, licensees, and\or guests for damages not caused by Landlord or Landlord's agents. Lanlord will not compensate Tenant or anyone else for damages caused by any other source whatsoever, or by Acts of God, and Tenant is therefore required to independently purchase insurance to protect Tenant, Tenant's family, Tenant's invitees, licensees, and\or guests, and all personal property on the leased premises and\or in any common areas from any and all damages.

**Utilities:**
Tenant will be responsible and pay for all utilities (gas, water, electric, refuse collection, telephone, cable or satellite TV), including all required deposits.

Tenant shall be responsible for contacting and arranging for any utility service not provided by the Landlord, and for any utilities not listed above. Tenant shall be responsible for having same utilities disconnected on the day Tenant delivers the leased premises back unto Landlord upon termination or expiration of this Lease.

**Alterations and Repairs by Tenant:**
Unless authorized by law, Tenant will not, without Landlord's prior written consent, alter, re-key or install locks to the premises or install or alter any burglar alarm system. Tenant will not remodel or make any structural changes, alterations or additions to the premises, will not paper, paint or decorate, nor install, attach, remove or exchange appliances or equipment such as air conditioning, heating, refrigerating or cooking units, radio or television antennae; not drive nails or other devises into the walls or woodwork (a reasonable number of picture hangers excepted), nor refinish or shellac wood floors, nor change the existing locks of the premises, without the prior written permission of the Landlord or his Agent. Any of the above-described work shall become part of the dwelling.

**Assignment of Agreement and Subletting:**
Tenant will not sublet the premises or any portion thereof, or assign this Lease without the prior written consent of Landlord.

**Surrender of Premises:**
Tenant will, upon termination of this lease, surrender the premises and all fixtures and equipment of Landlord therein in good, clean and operating condition, ordinary wear and tear excepted. Tenant shall, at time of vacating premises, clean said premises including stove and refrigerator and remove trash from the premises. Upon vacating the premises

Tenant shall deliver all keys thereto to the Landlord or his Agent within twenty-four (24) hours after vacating. Failure to comply will be cause to charge Tenant for changing locks.

### Landlord's Right to Access and Inspection:

In addition to the rights provided by applicable state law, in the event of an emergency, to make repairs or improvements or to show the premises to prospective buyers or tenants or to conduct an annual inspection or to address a safety or maintenance problem or to remove any alterations, additions, fixtures, and any other objects which may be affixed or erected in violation of the terms of this Lease, Landlord or Landlord's duly authorized agents may enter the premises. Except in cases of emergency, Tenant's abandonment of the premises, court order or where it is impractical to do so, Landlord shall give Tenant reasonable notice before entering. Furthermore, Landlord retains a Landlord's Lien on all personal property placed upon the premises to secure the payment of rent and any damages to the leased premises.

### Termination of Lease - Hold Over:

Either Landlord or Tenant may terminate this lease at the expiration of said Lease or any extension thereof by giving the other thirty (30) days written notice prior to the due date. If Tenant shall hold over after the expiration of the term of this Lease, Tenant shall, in the absence of any written agreement to the contrary, be a tenant from month to month, as defined by applicable state law, at the monthly rate in effect during the last month of the expiring term. All other terms and provisions of this Lease shall remain in full force and effect.

In the event Tenant becomes a month-to-month tenant in the manner described above, Tenant shall be required to provide Landlord, in advance, a thirty (30) day written notice of Tenant's intention to surrender the Premises. Landlord, at Landlord's discretion, at any time during a month-to-month tenancy, may terminate the month-to-month tenancy or lease by serving Tenant with a written notice of termination, or by any other means allowed by applicable state law. Upon termination, Tenant shall vacate the premises and deliver same unto Landlord on or before the expiration of the period of notice.

### Extended Absences by Tenant and Notice Thereof:

Tenant will notify Landlord in advance if Tenant will be away from the premises for seven (7) or more consecutive days. During such absence, Landlord may enter the premises at times reasonable necessary to maintain the property and inspect for needed repairs. If such absences are customary and frequent, the expected frequency and duration of absence should be summarized here:

### Abandonment:

Abandonment shall be defined as the absence of the Tenant from the leased premises for a period of seven (7) or more consecutive days while rent or any monies owing remain unpaid. In such event, Tenant will be considered in default or this Lease. This definition

is subordinate to, and shall not in any way impair, the rights and remedies of Landlord
under this Lease and\or applicable state law, except in the case of abandonment, Landlord
or Landlord's agents may immediately or any time thereafter enter and re-take the leased
premises as provided by applicable state law, and terminate this Lease without notice to
Tenant.

### Property Damage - Destruction of Property:

If the premises are rendered totally unfit for occupancy by fire, act of God, act of rioters
or public enemies, or accident, the term of this Lease shall immediately cease upon the
payment of rent apportioned to the day of such happening. If, however, the premises are
only partially destroyed or damaged and Landlord decides to repair the same, such repairs
shall be made by Landlord without unreasonable delay, and there shall be abatement in
rent on proportion to the relationship the damaged portion of the leased premises bears to
the whole of said premises. Tenant, Tenant's guests and invitees of either Tenant or
Tenant's guests will not engage in any activity or action that may cause severe property
damage.

### Hold Harmless:

To the fullest extent permitted by applicable state law, Landlord and his Agent will be
held free and harmless from any and all loss, claim or damage by reason of any accident,
injury, or damage to any person or property occurring on or about the leased premises,
unless such accident, injury, or damaged shall be caused by the negligence of the
Landlord, its agents, servants and\or employees.

### Default \ Breach By Tenant:

In the event of any default hereunder on the part of the Tenant, his family, servant, guests,
invitees, or should the Tenant occupy the subject premises in violation of any lawful rule,
regulation or ordinance issued or promulgated by the Landlord or any rental authority,
then and in any of said events the Landlord shall have the right to terminate this lease by
giving Tenant personally or by leaving at the leased premises a thirty (30) day written
notice of termination and the Lease shall terminate upon the expiration of (30) days from
the delivery of such notice if the default is not remedied within a reasonable time not in
excess of thirty (30) days and the Landlord, at the expiration of said thirty (30) day notice
or any shorter period conferred under or by operation of law, shall thereupon be entitled
to immediate possession of said premises and may avail himself of any remedy provided
by law for the restitution of possession and the recovery of delinquent rent. If this Lease
is terminated, Landlord shall return all prepaid and unearned rent, and any amount of the
security deposit recoverable by the Tenant.

However, in the event the default is nonpayment of rent, Landlord shall not be required to
deliver thirty (30) days notice as provided above but may serve Tenant with a seven (7)
day written notice of termination whereupon the Tenant must pay the unpaid rent in full
or surrender the premises by the expiration of the seven (7) day notice period.
Furthermore, for any substantial violation of this Lease or applicable law materially
affecting health and safety, Landlord may serve Tenant with a three (3) day written notice

of termination whereupon the Tenant must cure the default by the expiration of the three (3) day notice period or surrender the premises. Upon Landlord's termination of this, Tenant expressly agrees and understands that unless prohibited by applicable state law, the entire remaining balance of unpaid rent for the remaining term of this Lease shall ACCELERATE, whereby the entire sum shall become immediately due, payable, and collectible. Landlord may hold the portion of Tenant's security deposit remaining after reasonable cleaning and repairs as a partial offset to satisfaction of the accelerated rent.

**Remedies - Cumulative:**
The remedies and rights contained in and conveyed by this Lease are cumulative, and are not exclusive of other rights, remedies and benefits allowed by applicable state law.

**Waiver:**
Any waiver of a default hereunder shall not be deemed a waiver of this agreement or this agreement or of any subsequent default. Acquiescence in a default shall not operate as a waiver of such default, even though such acquiescence continues for an extended period of time.

**Grounds for Termination of Tenancy:**
The failure of Tenant, guests and invitees of either tenant or guests to comply with any term of this Lease is grounds for termination of the tenancy, with appropriate notice to Tenant and procedures as required by law.

**Court Costs and Attorneys Fees:**
In the event that the Landlord shall find it necessary to expand any monies in legally enforcing any provisions of this lease, including the collection of rent or other charges due hereunder, Tenant agrees to pay a reasonable attorney's fee and all expenses and costs incurred thereby, to the greatest extent allowed by applicable law.

**Agents and Authority to Receive Legal Papers:**
Any notice which either party may or is required to give, shall be in writing and may be given by mailing the same, by certified mail, and shall be deemed sufficiently served upon tenant if and when deposited in the mail addressed to the leased premises, or addressed to Tenant's last known post office address, or hand delivered, or placed in Tenant's mailbox to Tenant at the premises. If Tenant is more than one person, then notice to one shall be sufficient as notice to all. The Landlord, any person managing the premises and anyone designated by the Landlord as agent are authorized to accept service of process and receive other notices and demands, which may be delivered to:

Bennie Willis
P.O. Box 83
Western Grove, AR 72685

**Time:**
Time is of the essence of this agreement.

**Subordination:**
Tenant agrees to accept the premises subject to and subordinate to any existing or future mortgage or other lien, and Landlord reserves the right to subject premises to same. Tenant agrees to and hereby irrevocably grants Landlord power of attorney for Tenant for the sole purpose of executing and delivering in the name of the Tenant any documents related to the Landlord's right to subject the premises to a mortgage or other lien.

**Eminent Domain:**
If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Tenant's use of the premises, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking, The rent shall be apportioned as of the termination date, and any rent paid for the period beyond that date shall be repaid to Tenant. Tenant shall not be entitled to any part of the award for such taking or any payment in lieu thereof.

**Paragraph Headings:**
The headings of particular paragraphs and subparagraphs are interested only for convenience and are not part of this Agreement and are not to act as a limitation on the scope of the particular paragraph to which the heading refers.

**Binding:**
This Lease shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, successors and assigns.

**Entire Agreement:**
This document and any Attachments constitutes the final and entire Agreement between the parties hereto, and not promises or representations, other than those contained here and those implied by law, have been made by Landlord or Tenant. Neither Landlord or Tenant shall be bound by any terms, conditions, statements, warranties or representations, oral or written, not herein contained unless made in writing and signed by both Landlord and Tenant.

**Governing Law:**
This Lease shall be governed by the laws of the state of New York.

**Severability:**
The provisions of this Lease are severable and in the event any provisions, clause, sentence, section or part thereof is held to be invalid, illegal, unconstitutional, inapplicable or unenforceability shall not affect or impair any of the remaining provisions, sentences, clauses, sections, parts of the lease or their application to Tenant or other persons or circumstances. It is understood and agreed that the terms, conditions and covenants of this Lease would have been made by both parties if such invalid, illegal, unconstitutional, inapplicable or unenforceable provision, sentence, clause, section or part had not been included therein to the extent that portion of this agreement may be invalid

by striking of certain words or phrases, such words or phrases shall be deemed to be stricken and the remainder of the provisions and the remainder of the other portions of this Lease agreement shall remain in full force and effect. It is further agreed that this Lease may be executed in counterparts, each of which when considered together shall constitute the original contract.

**Additional Provisions:**

Address: _P O Box 83_
_____Weston Groc Ac 72685_
Phone: _870-439-2672_

Witness to Landlord's Signature _Bennie E. Willis_
Print Name: _Bennie Willis_          Date: _5-27-06_

Tenant's Signature: _____
Print Name: _Richard Boggala_ Date: _5-25-06_

Tenant's Signature: _____
Print Name: _Lisala Bovedala_  Date: _5-25-06_

# EXHIBIT E

LEVIN & CHETKOF, LLP
Michael G. Levin, Esq. (MGL – 5441)
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===================================X          Civil Action No.:  07-Cv-3646 (SCR)(MDF)

BENNIE WILLIS,

                    Plaintiff(s)                         **PROPOSED** *ANSWER*
                                                         **_WITH COUNTERCLAIMS_**

          -against-

LANDAMERICA ONESTOP, INC., d/b/a               Jury Trial Demanded
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

                    Defendant(s).

===================================X


          Defendants Richard Rovegno and Laura Rovegno (hereinafter referred to as the

"ROVEGNO" defendants and/or the "ROVEGNOS"), by their attorneys LEVIN & CHETKOF,

LLP, answers the complaint of plaintiff Bennie Willis as follows:

**_Parties_**

          1.       Deny knowledge or information sufficient to form a belief as to each and

every allegation contained in paragraph "1" of the complaint.

          2.       Deny knowledge or information sufficient to form a belief as to each and

every allegation contained in paragraph "2" of the complaint.

3.      Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "3" of the complaint.

4.      Deny each and every allegation contained in paragraph "4" of the complaint, except admit that the ROVEGNOS are residents of Rockland County, New York.

***Jurisdiction and Venue***

5.      Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "5" of the complaint, except admit that said paragraph alleges that this action is brought pursuant to, and jurisdiction is based upon, certain statutory authority.

6.      Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "6" of the complaint, except admit that said paragraph alleges that this action is brought pursuant to, and venue is based upon, certain statutory authority.

***Facts***

7.      Deny each and every allegation contained in paragraph "7" of the complaint, except admit that the parties entered into a transaction in order to save the ROVEGNOS' home for them.

8.      Deny each and every allegation contained in paragraph "8" of the complaint, except admit that the parties entered into a transaction in order to save the ROVEGNOS' home for them.

9.      Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "9" of the complaint.

10.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "10" of the complaint.

11.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "11" of the complaint.

12.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "12" of the complaint.

13.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "13" of the complaint.

14.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "14" of the complaint.

15.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "15" of the complaint.

16.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "16" of the complaint.

17.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "17" of the complaint.

18.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "18" of the complaint.

19.     Deny each and every allegation contained in paragraph "19" of the complaint, but admit that due to the representations and machinations of plaintiff and Terry Metheny, and individual with whom he was acting in concert, a deed was issued.

20.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "20" of the complaint.

3

21.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "21" of the complaint.

22.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "22" of the complaint.

23.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "23" of the complaint.

24.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "24" of the complaint.

25.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "25" of the complaint.

26.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "26" of the complaint.

27.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "27" of the complaint.

28.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "28" of the complaint.

29.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "29" of the complaint.

30.     Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "30" of the complaint.

31.     Deny each and every allegation contained in paragraph "31" of the complaint, except admit that a fire burned the premises known as 28 Terri Lee Lane, New Hempstead, New York.

4

32.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "32" of the complaint.

33.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "33" of the complaint.

34.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "34" of the complaint.

35.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "35" of the complaint.

36.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "36" of the complaint and deny each and every allegation as they pertain to the ROVEGNO defendants.

37.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "37" of the complaint.

38.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "38" of the complaint, deny each and every allegation as they pertain to the ROVEGNO defendants, except admit that documents have not been re-executed due to the acts and/or omissions of the plaintiff and Terry Metheny, an individual with whom he was acting in concert.

39.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph "39", except admit that the ROVEGNOS should still be the deeded owners of the property and, upon information and belief, that the money intended to satisfy all claimed judgments and liens was converted by Terry Metheny, an individual acting in concert with plaintiff Bennie Willis.

## *AS TO THE FIRST CLAIM*

40.    In answer to paragraph "40" of the complaint, the answering defendants repeat, reiterate and reallege each and every denial or denial of knowledge or information sufficient to form a belief as set forth in response to paragraphs "1" through "39" of the complaint as if fully set forth herein.

41.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "41" of the complaint.

42.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "42" of the complaint.

43.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "43" of the complaint.

44.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "44" of the complaint.

45.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "45" of the complaint.

## *AS TO THE SECOND CLAIM*

46.    In answer to paragraph "46" of the complaint, the answering defendants repeat, reiterate and reallege each and every denial or denial of knowledge or information sufficient to form a belief as set forth in response to paragraphs "1" through "45" of the complaint as if fully set forth herein.

47.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "47" of the complaint.

48.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "48" of the complaint.

49.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "49" of the complaint.

50.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "50" of the complaint.

51.    Deny knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "51" of the complaint.

## *AS TO THE THIRD CLAIM*

52.    In answer to paragraph "52" of the complaint, the answering defendants repeat, reiterate and reallege each and every denial or denial of knowledge or information sufficient to form a belief as set forth in response to paragraphs "1" through "51" of the complaint as if fully set forth herein.

53.    Denies knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "53" of the complaint.

54.    Denies knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "54" of the complaint.

55.    Denies knowledge or information sufficient to form a belief as to each and every allegation contained in paragraph "55" of the complaint.

## *AS TO THE FOURTH CLAIM*

56.    In answer to paragraph "56" of the complaint, the answering defendants repeat, reiterate and reallege each and every denial or denial of knowledge or information

sufficient to form a belief as set forth in response to paragraphs "1" through "55" of the complaint as if fully set forth herein.

57.    Deny each and every allegation contained in paragraph "57" of the complaint as they pertain to the answering defendants.

58.    Deny each and every allegation contained in paragraph "58" of the complaint as they pertain to the answering defendants.

## FIRST AFFIRMATIVE DEFENSE

59.    Plaintiffs fail to state a claim for which relief can be granted as against the answering defendants.

## SECOND AFFIRMATIVE DEFENSE

60.    Plaintiffs have suffered no damages as a consequence of any action of the answering defendants.

## THIRD AFFIRMATIVE DEFENSE

61.    Plaintiffs' claims are barred by the limitations of the action, and/or the applicable equitable doctrine of laches, unclean hands, waiver, ratification, estoppel, and in pari delicto.

## FOURTH AFFIRMATIVE DEFENSE

62.    Plaintiff's claims are barred by the actions of third persons, Terry Metheny, with whom plaintiff is acting in concert.

## FIFTH AFFIRMATIVE DEFENSE

63.    Plaintiff's action is barred by application of the doctrine of fraud in the inducement.

## SIXTH AFFIRMATIVE DEFENSE

64.     Plaintiff's action is barred by reason of his failure to abide by his agreement to return the premises known as 28 Terri Lee Lane, New Hempstead, New York, to the ROVEGNOS.

## SEVENTH AFFIRMATIVE DEFENSE

65.     Plaintiff's action is barred by reason of his material breach of the Residential Lease Purchase Option Agreement.

## EIGHTH AFFIRMATIVE DEFENSE

66.     Plaintiff's action is barred and/or mitigated by plaintiff's breach of his agreement to insure the ROVEGNOS' possession under the aforesaid Residential Lease Purchase Option Agreement, which possessions were then destroyed by fire.

## CROSS-CLAIM AGAINST CO-DEFENDANTS LANDAMERICA and ACRANET

67.     Plaintiff's injuries or damage, if any, are caused solely by the acts and/or omissions of co-defendants LANDAMERICA and/or ACRANET, and not by any act of negligence, malfeasance or breach of contract on the part of the ROVEGNO defendants.

68.     As a result of the foregoing, co-defendants LANDAMERICA and/or ACRANET are obligated to indemnify and hold harmless the ROVEGNO defendants from and against any and all liability and damages which may be imposed upon it by reason of this lawsuit and that if any negligence, malfeasance or liability is found to exist on the part of the ROVEGNO defendants, such liability and negligence will be secondary and/or passive or the result solely of the operation of law as opposed to the liability of the co-defendants whose liability will be primary and active.  In such event, the ROVEGNO defendants demand judgment over and against the co-defendants for the amount of any verdict or judgment which shall or may

be had against it in this action, together with all costs and expenses which may be incurred in the defense of this action.

## AS AND FOR THE ROVEGNOS' COUNTER-CLAIMS

### Venue

69.    This Court maintains jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because the plaintiffs and defendants are all citizens of different states and the amount in controversy exceeds the sum of $75,000.00.

70.    Venue is proper pursuant to 28 U.S.C. §1391(a)(2) in that the property at issue herein, 28 Terri Lee Lane, New Hempstead, New York, is situated within this judicial district.

### Facts Common to all Counterclaims

71.    The ROVEGNOS were the deeded, fee simple owners of certain real estate known as 28 Terri Lee Lane, New Hempstead, New York since their purchase of the premises in December 2000.

72.    In 2005 defendant RICHARD ROVEGNO lost his job a JP Morgan Chase and remained unemployed for over one (1) year.

73.    At that time, the ROVEGNOS' mortgagee, Champion Mortgage, was threatening foreclosure, causing the ROVEGNOS to become distraught and anxiety ridden.

74.    The ROVEGNOS then began to receive unsolicited telephone calls from an individual named Terry Metheny, who represented himself as an expert in the field of mortgage refinance and debt consolidation. Mr. Metheny told the ROVEGNOS that he could save their home by avoiding foreclosure and allowing them to stay in their home.

75.     The ROVEGNOS, while skeptical, were in dire straights and Mr. Metheny was very persuasive.  In fact, when asked why he was helping them, he told them a story of having lost his home due to being laid up with a broken back and unable to work.  He told them that he was determined to not let that kind of thing happen to the ROVEGNOS.

76.     At first, Mr. Metheny was entrusted with finding refinancing for the ROVEGNOS so that they could satisfy their existing mortgage.  However, shortly after agreeing to do so, Mr. Metheny advised them that he could obtain financing for them.  He never supplied any paperwork or documentation substantiating his efforts in that regard.

77.     Mr. Metheny then suggested that the ROVEGNOS "sell" their home to Mr. Metheny's relative, plaintiff Bennie Willis, while they continued to live in their home pursuant to a lease/repurchase agreement.

78.     The ROVEGNOS, based upon the representations of Mr. Metheny and Bennie Willis, did enter into an agreement to "sell" their home, with the understanding that they would continue to reside in it and buy it back at the end of the first year pursuant to the lease/repurchase agreement.  The "sale" was intended, in fact, a mortgage.

79.     In an e-mail dated May 4, 2006, the day before the purported closing, Mr. Metheny confirmed that (i) the "sale" and deed was intended to be a mortgage; and (ii) that the home was to be sold back to the ROVEGNOS at the end of the first year.  Further, Mr. Metheny and his father-in-law, both agreed to insure the ROVEGNOS' property while they were occupants of the home until the buy back.

80.     A purported closing took place on May 5, 2006 in Arkansas.  The ROVEGNOS were not present.

11

81.     At the purported closing, the ROVEGNOS' prior mortgage was to be satisfied and an additional $90,000.00 to $100,000.00 of the ROVEGNO funds were to be used to satisfy any and all of their debts, including, without limitation, real property taxes.

82.     However, Mr. Metheny, having received the funds did not utilize them to pay off the ROVEGNOS' debts.  Instead, the money was, upon information and belief, converted for Mr. Metheny's and possibly his father-in-law, plaintiff Bennie Willis' own use.

83.     Despite continued demand for an accounting as to the location and application of the aforesaid funds, neither Mr. Metheny nor his father-in-law, plaintiff Bennie Willis, has provided one.

84.     The ROVEGNOS continued to reside in their home at 28 Terri Lee Lane, New Hempstead, New York, pursuant to the Residential Lease Buyback Agreement.  However, in March 2007, the home was virtually destroyed in a fire.  Nearly all of the ROVEGNOS' possessions were also destroyed.

85.     The ROVEGNOS immediately notified plaintiff so that they could file an insurance claim.  Plaintiff Bennie Willis, despite having agreed to provide insurance coverage on the premises for the ROVEGNOS' benefit advised them that he failed to acquire coverage for them.

86.     The ROVEGNOS had lost their home; virtually all of their possessions; and approximately $90,000.00 to $100,000.00 due to the representations of plaintiff Bennie Willis and Terry Metheny, his son-in-law.

87.     Plaintiff Bennie Willis collected all of the fire insurance proceeds concerning the premises and has attempted to sell the premises in question in violation of the Residential Lease Buyback Agreement.  Mr. Willis' understanding of the ROVEGNOS' right to

buyback the premises in contained in brokerage agreement with Prudential Rand Realty which provides for no broker fee if the property is sold back to the ROVEGNOS.

88.    Neither Mr. Metheny nor plaintiff Bennie Willis, told the ROVEGNOS that Mr. Willis was no mere "relative", but was the owner and operator of a mortgage and finance company that operated out of the same P.O. Box as his son-in-law Terry Metheny in Western Grove, Arkansas.

89.    Plaintiff has nonetheless refused to acknowledge his obligation to return the home to the ROVEGNOS and has instead sought to further advance his scheme to defraud the ROVEGNOS by demanding that they re-execute certain transfer documents and by utilizing a purported residential lease (absent the buyback provision) that was never seen nor signed by the ROVEGNOS.

90.    Plaintiff Bennie Willis, individually and acting in concert with current non-party Terry Metheny, conspired to commit, aided and abetted in the commission of, and did commit fraud; as well as violations of the New York State Deceptive Practice Action (General Business Law § 349); New York General Obligations Law §§ 5-501(1) and (2); the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.); and the Truth-In-Lending Act (15 U.S.C. § 1691 et seq.).

### *AS AND FOR A FIRST COUNTER CLAIM*

91.    This counterclaim is brought, inter alia, pursuant to Article 15 pf the Real Property Actions and Proceedings Law to compel the determination of claims to real property hereinafter described.

92.     The property in question is known as 28 Terri Lee Lane, New Hempstead, New York, which was owned in fee simple by the ROVEGNOS until May 2006 when a transaction was entered with the intent to save the ROVEGNOS' home

93.     That the plaintiff Bennie Willis claims to be the rightful owner of the aforesaid premises, having fraudulently obtained a deed to said property from the ROVEGNOS on or about May 5, 2006, and having attempted to record said fraudulently obtained deed since that time.

94.     Than any judgment granted herein will not affect any person or persons not in being or now ascertained; who by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the subject premises, and that every person in being who would have been entitled to such estate or interest, if not a party herein, is unknown to the ROVEGNOS.

95.     By virtue of the aforesaid fraudulent acquisition of title by plaintiff Willis, the ROVEGNOS are entitled to a judgment that the Plaintiff, and all persons claiming under him, be forever barred from all claim to an estate or interest in the property described herein; that the ROVEGNOS are the lawful owners of said property and are vested with an absolute and unencumbered title in fee simple to the property described hereinabove; and that sole and complete possession of the aforesaid premises be awarded to the ROVEGNOS and that they remain in possession thereof.

### AS AND FOR A SECOND COUNTERCLAIM

96.     The ROVEGNOS repeat and reallege paragraphs "69" through "95" as though fully set forth herein.

97.    The deed purportedly conveying the subject property from the ROVEGNOS to plaintiff Willis, although allegedly absolute on its face, must be considered at most a mortgage as a matter of law.

98.    Under New York State common law and New York Real Property Law § 320, "A deed conveying real property, which by any other instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, must be considered as a mortgage."

99.    Both the e-mail dated May 4, 2006, the day before closing, and the Residential Lease Buyback Agreement, demonstrate that the subject transaction, even if not found to be wholly fraudulent, was at most an equitable mortgage under Real Property Law § 320.

100.    Further, plaintiff and Terry Metheny made various statements and representations that involving the ROVEGNOS' ability to buyback the premises at the end of the one (1) year term and plaintiff Willis executed a brokerage agreement after the fire establishing that no commission was to be paid if the premises were sold back to the ROVEGNOS.

101.    Based upon the representations, documentation and other pertinent material, it is evident that the "deed" was actually a mortgage as set forth in NYRPL § 320 and as such, the ROVEGNOS remain the owner of the premises.

102.    Further, by converting the ROVEGNOS' funds totaling approximately $90,000.00 to $100,000.00 for his and his son-in-law's own use, plaintiff Willis has violated General Obligations Law §5-511.

103.    Based upon the foregoing, the plaintiff's action should be dismissed in its entirety and a declaration issued that the purported deed amounts to a mortgage, leaving the ROVEGNOS in possession of their home.

### AS AND FOR A THIRD COUNTERCLAIM

104.    The ROVEGNOS repeat and reallege paragraphs "69" through "103" as though fully set forth herein.

105.    Plaintiff, with the intent to defraud the ROVEGNOS, induced them to enter the subject transaction by making intentional misrepresentations and/or failing to provide material information.  Among the false and misleading representations and promises plaintiff made to the ROVEGNOS were the following:  the transaction was intended to "save" the ROVENGNOS' home for them; he would return the home to the ROVEGNOS at the end of the one (1) year period; that the parties had entered into a Residential Lease Buyback Agreement; that the additional $90,000.00 to $100,000.00 of the ROVEGNOS' money was to pay off their debt and liens; that he had obtained insurance to cover the ROVEGNOS' possessions; that he was just a relative of Terry Metheny, as opposed to the owner and operator of a mortgage and finance company; that Mr. Metheny was engaged as a mortgage refinance expert and debt consolidator.

106.    As the proximate result of their reliance upon the plaintiff's actions, representations and failures to disclose, the ROVEGNOS suffered actual damages in an amount to be determined by a trier of fact, including, without limitation the loss of their home, possessions and approximately $90,000.00 to $100,000.00 of their money.

107.     Plaintiff Willis' actions were willfully, intentionally and knowingly fraudulent, rendering the deed purportedly conveying the subject property to Mr. Willis null and void.

108.     Plaintiff Willis engaged in the foregoing conduct as part of a scheme to defraud distressed property owners out off title to their homes.

109.     Plaintiff Willis is liable to the ROVEGNOS for actual damages, punitive damages, costs and disbursements, and reasonable attorneys' fees.

## AS AND FOR A FOURTH COUNTERCLAIM

110.     The ROVEGNOS repeat and reallege paragraphs "69" through "109" as though fully set forth herein.

111.     Plaintiff Willis knowingly entered into a common plan and/or agreement to induce the ROVEGNOS to entire into the subject transaction by making mispresentations and/or failing to provide material information.

112.     Plaintiff Willis intentionally participated in a scheme by inducing the ROVEGNOS to enter into the subject transaction by making misrepresentations and/or fraudulently concealing material information, in furtherance of the conspiracy.

113.     As the proximate result of their reliance on plaintiff Willis' actions and representations, the ROVEGNOS suffered actual damages in an amount to be determined by a trier of fact, including, without limitation the loss of their home, possessions and approximately $90,000.00 to $100,000.00 of their money, and the expense of refinancing the mortgage at the prevalent rates and costs.

114.     Said conspiracy renders void and unenforceable the deed purportedly conveying the subject property to plaintiff Willis.

115.    Plaintiff Willis is liable to the ROVEGNOS for actual damages, punitive damages, costs and disbursements, and reasonable attorneys' fees.

### AS AND FOR A FIFTH COUNTERCLAIM

116.    The ROVEGNOS repeat and reallege paragraphs "69" through "115" as though fully set forth herein.

117.    Upon information and belief, plaintiff Willis "conducted a business" and/or "furnished a service" as those terms are defined in New York State General Business Law § 349 (the "Deceptive Practices Act").

118.    Upon information and belief, plaintiff Willis violated the Deceptive Practices Act by engaging in acts and practices that were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business.

119.    The practices include the following:  the transaction was intended to "save" the ROVENGNOS' home for them; he would return the home to the ROVEGNOS at the end of the one (1) year period; that the parties had entered into a Residential Lease Buyback Agreement; that the additional $90,000.00 to $100,000.00 of the ROVEGNOS' money was to pay off their debt and liens; that he had obtained insurance to cover the ROVEGNOS' possessions; that he was just a relative of Terry Metheny, as opposed to the owner and operator of a mortgage and finance company; that Mr. Metheny was engaged as a mortgage refinance expert and debt consolidator.

120.    In addition, the plaintiff violated the Deceptive Practices Act by further failing and refusing to provide an accounting of the $90,000.00 to $100,000.00 received from the ROVEGNOS for the purpose of satisfying liens/debts at closing.

18

121.    As the proximate result of their reliance on plaintiff Willis' actions and representations, the ROVEGNOS suffered actual damages in an amount to be determined by a trier of fact, including, without limitation the loss of their home, possessions and approximately $90,000.00 to $100,000.00 of their money, and the expense of refinancing the mortgage at the prevalent rates and costs.

122.    Plaintiff Willis' actions have had and may continue to have a broad impact on consumers throughout New York State.

121.    Plaintiff Willis is liable to the ROVEGNOS for actual damages, punitive damages, costs and disbursements, and reasonable attorneys' fees.

**WHEREFORE**, the answering defendants respectfully request that this Court enter a judgment against plaintiff (a) dismissing the Complaint against them, (b) granting the answering defendants the costs and disbursements of this action including its counsel fees; (c) awarding the defendant the relief sought in their counterclaims, and (d) for such other and further relief as the Court deems just and proper.

Dated:  Westbury, New York
        May 23, 2008

                                    **LEVIN & CHETKOF, LLP**

                                    By: _____
                                            **Michael G. Levin, Esq.** (MGL 5441)
                                    Attorneys for Defendant Rovegno
                                    265 Post Avenue - Suite 290
                                    Westbury, New York 11590
                                    (516) 338-2888
                                    File No.:  GL 18050

To:    LAW OFFICE OF DIANE McFADIN
       Attorney for Plaintiff
       11 Broadway – Suite 715
       New York, New York 10004
       646-723-2757

LOEB & LOEB, LLP
Attorneys for Defendant
    Lawyers Title Insurance Corp.
345 Park Avenue
New York, New York 10154

WILSON, ELSER, MOSCOWITZ,
    EDELMAN & DICKER, LLP
Attorneys for Defendant Acranet
150 E. 42nd Street
New York, New York 10017
212-490-3000

GL\ROVEGNO\GL 18050\LEGAL\PROPOSED ANSWER

==================================================================

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BENNIE WILLIS,

     Plaintiff,

          - against -

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MOTION
## TO VACATE PARTIAL DEFAULT JUDGMENT DATED OCTOBER 19, 2007

 

LEVIN & CHETKOF, LLP
Attorneys for Defendants Rovegno
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888

==================================================================

07-Cv-3646 (SCR)(MDF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
===================================X        Civil Action No.:  07-Cv-3646 (SCR)(MDF)

BENNIE WILLIS,

                    Plaintiff(s)

     -against-

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE CORP.,
ACRANET MORTGAGE SETTLEMENT
SOLUTIONS, LLC d/b/a ACRANET LENDSERV,
RICHARD ROVEGNO and LAURA ROVEGNO,

                  Defendant(s).

===================================X

## PRELIMINARY STATEMENT

       Defendants RICHARD ROVEGNO and LAUR ROVEGNO (the "ROVEGNO" defendants or the "ROVEGNOS") respectfully submit this memorandum of law in support of their motion for an Order pursuant to FRCP 55(c) and/or 60(b) to vacate the Partial Default Judgment dated October 19, 2007 (which granted plaintiff's motion for a partial default by reason of the ROVEGNO defendants' failure to serve an answer), and to permit the ROVEGNO defendants to serve an answer in the form annexed to the Affidavit of Richard Rovegno (the "Rovegno Affidavit" as Exhibit "E").

## STATEMENT OF FACTS

       The facts in support of this motion are set forth in detail in the Rovegno Affidavit and Michael G. Levin, Esq., and the exhibits annexed thereto.

### Prior Proceedings

Pursuant to a summons and complaint dated May 2, 2007 and filed on May 8, 2007, plaintiff BENNIE WILLIS, seeks damages (i) based in negligence as against defendants LandAmerica Onestop, Inc. d/b/a Lawyers Title Services Company, Inc. and/or Lawyers Title Insurance Corporation (hereinafter "LANDAMERICA") and Acranet Mortgage Settlement Solutions, LLC d/b/a Acranet Lendserv (hereinafter "ACRANET") for allegedly failing to procure and properly record closing and transfer documents relating to the purported sale of the premises known as 28 Terri Lee Lane, New Hempstead, New York; (ii) based upon fraudulent concealment as against defendants LANDAMERICA and ACRANET for allegedly "willfully and wantonly" concealing from plaintiff their collective failure to properly file and record the deed and procure and file the transfer documents and to secure a title insurance property relative to the premises known as 28 Terri Lee Lane, New Hempstead, New York; (iii) based upon violation of the New York General Business Law as against defendants LANDAMERICA and ACRANET for allegedly engaging in deceptive and misleading conduct with respect to the furnishing of title services to a consumer; and (iv) based in specific performance as against the ROVEGNOS for allegedly failing to re-execute closing and/or transfer documents relating to the purported sale of the premises known as 28 Terri Lee Lane, New Hempstead, New York.   Plaintiff's claims are predicated upon a "contract of sale" dated April 21, 2006 and a purported "closing" of the transaction on May 5, 2006.  See Levin Affirmation, Exhibit "A".

The summons and complaint were served upon ROVEGNO defendants on May 17, 2007.  Consequently, the ROVEGNOS' answer was required to be served on or before June 17, 2007.

The ROVEGNO defendants, however, failed to serve an answer.  By Judgment dated

October 19, 2007, the Clerk of the Court noted the ROVEGNOS' default (Rovegno Affidavit, Exhibit "C").

**ROVEGNOS' Notice of its Default**

In or about early 2008, the ROVEGNO defendants had a conversation with counsel for defendants LANDAMERICA. Thereafter, being advised as to the entry of the partial default judgment, the ROVEGNOS, by letter and declaration dated February 29, 2008, appeared before this court requesting the appointment of counsel on their behalf. The court, in declining the ROVEGNOS' application granted them time to procure counsel, something they only recently were able to accomplish.

The ROVEGNO defendants never intended to default or abandon any claims they may have in this action, and indeed they had tried to retain counsel to represent their interests. However, due to the enormity of the strain in having been, upon information and belief, defrauded out of their home, followed by the subsequent fire that destroyed nearly all of their material possessions, the ROVEGNOS were unable to properly defend themselves.

**ROVEGNOS' Motion to Vacate the Partial Default**

Due to the sheer magnitude and effort required to oppose plaintiff's claims, propose the appropriate counter-claims; and investigate third-party actions, extensive work has entailed.

This motion has required an investigation into how the ROVEGNO defendants defaulted in serving an answer as well as into the merits of plaintiff's claims, which, upon information and belief, is predicated on a real estate transaction potentially involving mortgage rescue fraud of the type now commonly winding its through both state and federal courts, in which unsuspecting lay people are fraudulently induced into signing over the deed to their homes in

exchange for representations regarding "sale-leaseback" agreements such as the one produced herein. See, Rovegno Affidavit, Exhibit "A".

Moreover, the investigation has required an examination of the documents, deposition transcripts and other papers previously exchanged in this matter, many of which revolve around banking and real estate documents.

## ROVEGNOS' Non-Willful Default

As demonstrated in both the Rovegno Affidavit and Levin Affirmation, the ROVEGNO defendants' default was not willful and deliberate. Instead, it was inadvertent and predicated upon the tremendous emotional and financial strain of having been *allegedly* defrauded out of their home; having sustained a loss of $90,000.00 to $100,000.00 of their money that was improperly converted; having been subjected to a fire in which virtually all of their worldly possessions were destroyed; and having been denied insurance coverage for their possessions due to plaintiff's and/or Terry Metheny's failure to properly insure their possessions.

Once the moving defendants were alerted to the imposition of the default and the mounting evidence of mortgage rescue fraud, they contacted the court to explore how they could seek representation. Thereafter, having been denied court assistance in the procurement, they began the search for counsel to assist them during their dire need.

## ROVEGNOS' Meritorious Defenses

Although the ROVEGNO defendants' investigation of plaintiff's connection to Terry Metheny is ongoing, the ROVEGNOS have at this time several meritorious defenses ranging from, inter alia, fraud in the inducement; forgery of closing documents/lease agreements; misrepresentation as to plaintiff's intention to comply with the buyback clause in the lease

agreement; failure to procure insurance for the ROVEGNOS' possessions while they were residing at 28 Terri Lee Lane, New Hempstead, New York after "closing"; conversion of the ROVEGNOS' money in the sum of between $90,000.00 and $100,000.00, which money was to be utilized to cover all property taxes and other debts; refusal and failure to provide an accounting of the ROVEGNOS' money; acting in concert with Terry Metheny to defraud the ROVEGNOS out of their home; upon information and belief, engaging in a scheme of mortgage rescue fraud, which may result in the voiding of the deed; and failure to make out a prima facie claim as against the ROVEGNO defendants based upon the fact that they were fraudulently induced into entering into the contract of sale                    in                    the                    first                    place.

**POINT**

**ROVEGNO DEFENDANTS' DEFAULT SHOULD
BE VACATED SINCE THEIR DEFAULT IS
EXCUSABLE AND THEY HAVE MERITORIOUS DEFENSES**

FRCP Rule 55(c), entitled Setting Aside Default, provides that "[f]or good cause shown the court may set aside an entry of default. . ."

Under FRCP Rule 55(c), "the principal factors bearing on the appropriateness of relieving a party of a default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented". Meehan v. Snow, 652 F.2d 274 (2d Cir. 1981); see also, Credit Lyonnais Securities (USA), Inc. v. Alcantara, 183 F.3d 151, 154 (2d Cir. 1999)("where, as here, a defendant opposes a plaintiff's motion for a default judgment (or moves to set aside a default judgment under Fed.R.Civ.P. 55(c)), the district court should consider three factors: 1) whether, and to what extent, the default was willful; 2) whether defendants have a meritorious defense; and 3) whether vacating the judgment would cause prejudice to the plaintiff"), citing SEC v. McNulty, 137 F.3d 732, 738 (2d Cir.1998) and Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 243 (2d Cir.1994).

Default judgments, which are "the most severe sanction which the court may apply", Securities & Exchange Comm'n v. Management Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975), are not favored, particularly when the case presents issues of fact, and all doubts are to be resolved in favor of a trial on the merits. See, Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949). As the Second Circuit has explained, "the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort", Meehan v. Snow, supra at 277, which should only be imposed "upon a serious showing of willful default". Gill v. Stolow, 240 F.2d 669, 670 (2d Cir.1957); see also, Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1986).

In the Second Circuit, "the preference is for the District Court to reach judgments on

the merits and not by way of default judgments". <u>Shah</u> v. <u>New York State Dept. of Civil Service</u>, 168 F.3d 610, 615 (2d Cir. 1999), citing <u>Cody</u> v. <u>Mello</u>, 59 F.3d 13, 15 (2d Cir.1995) ("This Court has expressed on numerous occasions its preference that litigation disputes be resolved on the merits, not by default") and <u>Meehan</u> v. <u>Snow</u>, <u>supra</u>.

Here, the ROVEGNO defendants' default in serving an answer should be vacated under FRCP 55(c) and/or 60(b) upon the grounds that their default is excusable and they have meritorious defenses.

## The ROVEGNO Defendants' Default Was Not Willful

In the context of a default, the Second Circuit has interpreted "willfulness" to refer to conduct that is more than merely "negligent or careless" or even grossly negligent.  See, <u>S.E.C.</u> v. <u>McNulty</u>, 137 F.3d 732, 738 (2d Cir. 1998); see also,  <u>American Alliance Ins. Co., Ltd.</u> v. <u>Eagle Ins. Co.</u>, 92 F.3d 57, 61 (2d Cir. 1996)(default due to filing mistake by defendant's in-house counsel's clerk, held not willful); <u>Arthur F. Williams, Inc.</u> v. <u>Helbig</u>, 208 F.R.D. 41, 44 (EDNY 2002)("Willfulness in the context of a default [is] conduct that is more than merely negligent or careless. . . The conduct of . . . the litigant must be egregious and ... not satisfactorily explained . . . [and] the defendant defaulted deliberately [citations omitted]").

Default procedures are a useful mechanism for ensuring the orderly administration of justice, particularly when a litigant is confronted with an obstructionist adversary, but this value must be balanced against the strong preference expressed in this Circuit for deciding disputes on the merits. *See* <u>Pecarsky</u> v. <u>Galaxiworld</u>.com Ltd., 249 F.3d 167, 174 (2d Cir. 2001) ("It is well established that default judgments are disfavored.  A clear preference exists for cases to be adjudicated on the merits."), and "[w]hen the party against whom the default or default judgment is entered is a *pro se* litigant, an additional consideration is at play, namely, a concern about the ability of *pro se* litigants to protect their rights".  . <u>Roberts</u> v. <u>Keith</u>, 2007 WL 2712853 (S.D.N.Y.)**.**  Thus,

as a general matter, "a district court should grant a default judgment sparingly and grant leave to set aside the entry of default freely when the defaulting party is appearing *pro se*." Enron, supra, at 96; Direct TV, Inc. v. Herring, 2004 WL 1588206 (W.D.N.Y.)(courts have a duty "to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training" and this duty "is even broader in the case of a pro se defendant who finds [himself] in court against [his] will with little time to learn the intricacies of civil procedure.").

Here, the Rovegno Affidavit establishes that the ROVEGNO defendants' failure to serve an answer was not willful and deliberate but was a direct result of their collective emotional breakdown and financial destitution which was caused by being duped out of their home; duped out of approximately $90,000 to $100,000; as well as the loss of virtually all of their material possessions in a fire for which they did not receive insurance proceeds ---- which is excusable under Arthur F. Williams, Inc., supra, and the other cases cited above. The ROVEGNOS did not want to default, but the complaint filed herein simply fell through the cracks of a family in monumental distress. Moreover, the ROVEGNOS' lack of willfulness is underscored by plaintiff's failure to give written or other notice in which he advised the moving defendants that they were in default and warned them that he intended to seek a default. Compare, S.E.C. v. McNulty, 137 F.3d 732, 738-739 (2d Cir. 1998)(default held "willful" where defendant's attorney's failed to answer complaint even after plaintiff had repeatedly warned him that it would move for entry of default); Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d at 243-44 (2d Cir. 1994)(default in answering held "willful" where defendants had "purposely evaded service for months"). Indeed, the ROVEGNOS' unsuccessfully sought representation to protect their interests in the litigation and to vacate the partial default judgment. Compare, Dixon v. Ragland, 2005 WL 2649484 (S.D.N.Y.)(where there is no evidence that a client has diligently sought out counsel, the courts are more likely to conclude that a party's inaction is willful), citing United States v. Cirami, 535 F.2d 736, 741 (2d Cir. 1976).

New York appellate courts have excused defaults for similar reasons.  In <u>Murphy</u> v.

<u>D.V. Waste Control Corp.</u>, 124 A.D.2d 573, 507 N.Y.S.2d 717 (2d Dep't 1986), the Appellate

Division, Second Department held that the trial court did not abuse its discretion in vacating a prior

order of default notwithstanding defendants' six-month delay in serving an answer.  The delay was

not deliberate, had not prejudiced plaintiff and defendant had established a meritorious defense.  In

pertinent part, this Court explained:

> Although the length of the defendants' delay in serving their answer
> (more than six months) cannot be considered minor [citations
> omitted], and the only explanation proffered for the delay was the
> negligence of the defendants' insurance broker, which is "akin to a
> law office failure" [citations omitted], the court did not abuse its
> discretion in granting the defendants' motion, given that the
> defendants have established a meritorious defense, the delay did not
> result in any prejudice to the plaintiffs and there was no showing that
> the delay was in any way deliberate [citations omitted].  As we have
> often pointed out, there is a long established policy favoring the
> resolution of cases on their merits [citations omitted] . . . .

**Plaintiff Will Not Be Prejudiced If ROVEGNOS' Default**
**Is Vacated and they are Allowed to Defend this Case on the Merits**

Although some delay will result if the ROVEGNO defendants' motion is granted,

"delay alone is not a sufficient basis for establishing prejudice"; it "must be shown that delay will

'result in the loss of evidence, create increased difficulties of discovery, or provide greater

opportunity for fraud and collusion'".  <u>Kowal</u> v. <u>Diamond Detective Agency</u>, 2006 WL 278132

(W.D.N.Y.); <u>Davis</u> v. <u>Musler</u>, <u>supra</u> 713 F.2d at 916 (2d Cir. 1986); see also, <u>Arthur F. Williams,</u>

<u>Inc.</u> v. <u>Helbig</u>, <u>supra</u>, 208 F.R.D. 41, 45 (EDNY 2002); <u>Pecarsky</u> v. <u>Galaxiworld.com Ltd.</u>, 249 F.3d

167, 174 (2d Cir. 2001)(Plaintiffs' proceeding to execute default judgment, submission of an expert

accountant's report, and motion to compel the individual defendants to produce documents, does not

constitute prejudice).

Here, since the delay will not result in loss of evidence, create increased difficulties

of discovery, or provide greater opportunity for fraud and collusion, plaintiff will not be prejudiced

if the ROVEGNOS' default is vacated and they are allowed to defend this case on the merits. <u>Davis</u> v. <u>Musler</u>, <u>supra</u>. Indeed, it could be argued that the absence of the vacatur would be prejudicial to the moving defendants because it would leave unchecked any prior fraud and collusion (i.e. plaintiff's relationship with Terry Matheny and forged lease document). Moreover, while the action was commenced in May of 2007, plaintiff waited until virtually the end of 2007 to file is motion for a partial default, thus negating any claims of expediency.

On the other hand, the ROVEGNOS will be severely prejudiced if their default is not vacated. If left standing, their default will lead to a harsh result ----- the loss of their home, the loss of approximately $90,000.00 to $100,000.00; the uninsured destruction of virtually all of their possessions; and the duplicative requirement of them to satisfy liens that were to have already been cleared. See, <u>Sony Corp.</u> v. <u>Elm State Electronics, Inc.</u>, 800 F.2d 317, 320 (2d Cir. 1986); <u>Phillips</u> v. <u>Weiner</u>, 103 F.R.D. 177, 179, 182 (D.Me.1984)(large sum of money involved militates against default judgment); <u>Horn</u> v. <u>Intelectron Corp.</u>, 294 F.Supp. 1153, 1154-55 (S.D.N.Y.1968)(motion for relief under both Rule 55(c) and Rule 60(b); default disfavored in matters involving large sum of money); <u>Henry</u> v. <u>Metropolitan Life Ins. Co.</u>, 3 F.R.D. 142, 144 (W.D.Va. 1942)("Matters involving such sums should not be determined by default judgments if it can reasonably be avoided....").

**ROVEGNOS Have Numerous Meritorious Defenses.**

On a motion to vacate a default, the defendant need not present "conclusive" evidence to show that it has a meritorious defense. <u>Davis</u> v. <u>Musler</u>, <u>supra</u>, 713 F.2d at 916 (2d Cir. 1986)("a defendant seeking to vacate a default judgment need not conclusively establish the validity of the defense(s) asserted"); <u>American Alliance Ins. Co., Ltd.</u> v. <u>Eagle Ins. Co.</u>, <u>supra</u>, 92 F.3d at 61 ("To satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage. A defense is meritorious if it is good at law so as to give the fact-finder some determination to make").

Here, the ROVEGNOS' numerous defenses are meritorious because they give the

fact-finder some determination to make. Davis v. Musler, supra,; American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., supra.  Indeed, some of the defenses would be a complete bar to plaintiff's recovery.  See, Pecarsky v. Galaxiworld.com Ltd., supra, 249 F.3d at 174 ("Because these claims, if proven at trial, would constitute a complete defense, appellants have demonstrated a meritorious defense for purposes of vacating the default judgment entered against them").

In fact, the ROVEGNOS' contention that they were defrauded out of their home by plaintiff acting in concert with Terry Metheny (currently a non-party) could, if proven, result in the voiding of the deed to plaintiff pursuant to New York State Real Property Actions and Proceedings Law ("RPAPL") Article 15, General Business Law §349, Federal Truth and Lending Act, 15 U.S.C. §1601, Federal Real Estate Settlement Procedures Act, 12 USC §2601; and New York Real Property Law ("RPL") §320 (the deed is actually a mortgage).

It is respectfully argued that when the facts are set forth, plaintiff's position is this matter is utterly without merit.

"Fraud in the inducement renders the obligation voidable based upon facts occurring prior or subsequent to its execution".  Dalessio v. Kessler, 6 AD3d 57, 61 (2d Dept. 2004). Moreover, the New York Court of Appeals has stated that "It is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of 'a material existing fact' upon which an action for rescission may be predicated".  Sabo v. Delman, 3 NY2d 155, 160 (1957).  Here, the ROVEGNO defendants were duped by representations of Terry Matheny, plaintiff's son-in-law, and, upon information and belief, plaintiff, as to their proposed help in saving the ROVEGNOS from foreclosure.  As set forth in the Rovegno Affidavit, the moving defendants assert that they had entered into a "Residential Lease Purchase Option Agreement" entitling them to live in their home and then buy it back at the end of one (1) year (Rovegno Affidavit, Exhibit "A").  In accordance with RPL §320, they contend that the deed is actually a mortgage.  The Terry Metheny e-mail dated May 4, 2006, one day prior to closing,

confirms this representation (Rovegno Affidavit, Exhibit "B").  Nevertheless, plaintiff herein has

produced a separate document that purports to be simply a lease agreement (i.e. missing the buyback

language) that the ROVEGNOS contend is a manufactured document (Rovegno Affidavit, Exhibit

"D").

      The ROVEGNOS affirmatively maintain that they are entitled to deny plaintiff's

claims upon the ground that they are predicated on a fraud.  The ROVEGNO defendants vigorously

contend that plaintiff's claims herein constitute an egregious, massive scheme by plaintiff WILLIS

and current non-party Terry Metheny to defraud them in what is commonly known as "mortgage

rescue" fraud.  See, Watson v. Melnikoff, N.Y.L.J., p. 27, col. 1 (May 15, 2008).  The ROVEGNOS'

proposed answer (Rovegno Affidavit, Exhibit "E") interposes several defenses and counterclaims

based upon fraud, deceptive business practices in violation of RPAPL Article 15, RPL §320; New

York's General Business Law § 349, Federal Truth and Lending Act, 15 U.S.C. §1601, Federal Real

Estate Settlement Procedures Act, 12 USC §2601.

      Finally, the obligation to "remove any and all liens and judgments assessed against

the real property located at 28 Terri Lee Lane, New Hempstead, New York" as asserted in both the

complaint and partial default judgment is both dubious and disingenuous in light of the acts and/or

omissions of plaintiff's son-in-law, Terry Metheny, in his conversion of the ROVEGNOS' money

which had been delivered to him at "closing" for just that very purpose.  As evidenced in the

Rovegno Affidavit, to the present date, Mr. Metheny, plaintiff's son-in-law, has failed and refused to

provide an accounting for the approximately $90,000.00 to $100,000.00 delivered to his possession.

      In view of the magnitude of the matter --- a family's home and possessions; the issues

of substantial public importance raised by the ROVEGNOS' defenses, the ROVEGNOS' reasonable

excuse for their default; the harsh punitive effect a default judgment will have on them; and the lack

of prejudice to plaintiff by reason of the delay; the ROVEGNOS respectfully submits that their (a)

default in serving an answer and (b) the partial default judgment dated October 19, 2007 should be vacated.  See, <u>Meehan</u> v. <u>Snow</u>, <u>supra</u>; <u>Lunderville</u> v. <u>Allen</u>, 366 F.2d 445 (2d Cir. 1966)(default vacated and defendant afforded an opportunity to defend plaintiff's complaint upon the merits in order to prevent a possible "miscarriage of justice").

**CONCLUSION**

**FOR THE FOREGOING REASONS,
AS WELL AS THOSE SET FORTH IN
THE ACCOMPANYING AFFIDAVIT,
<u>ROVEGNOS' MOTION SHOULD BE GRANTED</u>**

Dated: Westbury, New York
          May 27, 2008

**LEVIN & CHETKOF, LLP**

By: _____
          **Michael G. Levin, Esq. (ML 5441)**
Attorneys for Defendants Rovegno
265 Post Avenue – Suite 290
Westbury, New York 11590
(516) 338-2888
Our File No.:  GL 18050

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
=====================================X    Civil Action No.:  07 Civ. 3646 (SCR)

BENNIE WILLIS,

                      Plaintiff(s)              ***CERTIFICATE OF SERVICE***

    -against-

LANDAMERICA ONESTOP, INC. d/b/a
LAWYERS TITLE SERVICES COMPANY, INC.,
and/or LAWYERS TITLE INSURANCE
CORPORATION, ACRANET MORTGAGE
SETTLEMENT SOLUTIONS, LLD, d/b/a
ACRANET LENDSERV, RICHARD ROVEGNO
and LAURA ROVEGNO

                     Defendant(s).

=====================================X

I hereby certify that on the 28th day of May 2008, I served a copy of the foregoing

Notice of Motion; Affidavit in Support; Affirmation in Support; Memorandum of Law and

Exhibits Annexed thereto upon counsel for all parties by securely enclosing the aforesaid

document in a postage paid wrapper and placed in a post office box regularly maintained by the

United States Postal Service in Westbury, New York in said County of Nassau, directed to the

following:

           LAW OFFICE OF DIANE McFADIN
           Attorney for Plaintiff
           11 Broadway – Suite 715
           New York, New York 10004

           LOEB & LOEB, LLP
           Attorneys for Defendant
              Lawyers Title Insurance Corp.
           345 Park Avenue
           New York, New York 10154

WILSON, ELSER, MOSCOWITZ,
   EDELMAN & DICKER, LLP
Attorneys for Defendant Acranet
150 E. 42nd Street
New York, New York 10017

Dated: Westbury, New York
      May 28, 2008

**LEVIN & CHETKOF, LLP**

By: _____
     **Michael G. Levin, Esq.** (MGL 5441)
Attorneys for Defendant Rovegno
265 Post Avenue - Suite 290
Westbury, New York 11590
(516) 338-2888
File No.:  GL 18050

2