

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BENNIE WILLIS,

                    Plaintiff,          07-CV-3646 (SCR)

- against -

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY INC.,
and/or LAWYERS TITLE INSURANCE     **AFFIDAVIT IN OPPOSITION**
CORPORATION, ACRANET MORTGAGE     **TO MOTION TO VACATE**
SETTLEMENT SOLUTIONS, LLC, d/b/a     **PARTIAL DEFAULT**
ACRANET LENDSERV, RICHARD ROVEGNO     **JUDGMENT**
and LAURA ROVEGNO,

                    Defendants.
-------------------------------------------------------------X

STATE OF NEW ARKANSAS)
                     ) ss:
COUNTY OF HARRISON  )

        BENNIE WILLIS, being duly sworn, deposes and says:

        1.)     I am the plaintiff in the above-captioned action. I am over the age of eighteen, suffer no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify.

        2.)     Around April of 2006, I began planning a move to the New York area because my daughter, son-in-law, Mr. Terry Metheny ("Mr. Metheny") and two grandchildren were going to move to the area because of work, and I wanted to be close to them. I hoped to buy a home that was large enough so that my family and me could live together in the same house.

        3.)     Through Mr. Metheny, who is in the mortgage business, I became aware of property located at 28 Terri Lee Lane, New Hempstead, New York (the "Property") which was then owned by Richard and Laura Rovegno ("the Rovegnos").

4.) I never went to the Property or spoke to the owners before I bought it, but I did see photos of it. I decided I wanted to buy it and offered to pay the asking price of $434,000.00. The Rovegnos accepted this offer, as shown in the "Purchase Agreement" (copy attached as Exhibit A). There was no mention in the Purchase Agreement of any option for the Rovegnos to buy back their home, and it was never discussed with me at the time of entering into the agreement, or at any other time. In addition, I never saw or agreed to the Lease Repurchase Agreement that was provided as Exhibit A to the Rovegno Affidavit. Regardless, since the Rovegnos stopped paying their rent in December of 2006, I wouldn't be obligated to do anything more for them anyway.

5.) Mr. Metheny helped me get two mortgages to buy the property. I was going to pay these mortgages off with the proceeds from the sale of my home in Western Grove, Arkansas along with some savings I had.

6.) I hired Defendant ("Acranet") to prepare all the closing documents, arrange the details of closing and to record the mortgages and deed after the closing. Acranet was also supposed to get all the insurance I needed, including an owner's title insurance policy in order to protect my substantial investment in the Property. Mr. Metheny was talking to someone who worked at Acranet on the phone and that person, who I believe was named Tricia Somerville, said that I wouldn't need a lawyer to represent me at the closing.

7.) During the closing, I signed literally dozens of documents. One was a "Waiver of Title Insurance" (copy attached as Exhibit B), even though I specifically asked for an owner's title insurance policy. However, no one ever explained to me what I was signing.

8.) After the closing, the Rovegnos talked to Mr. Metheny and told him they had no place to live. Since I wasn't going to move into the Property right away, I decided to rent

2

the Property to the Rovegnos on a month to month basis, through a written Lease Agreement (copy attached as Exhibit C). The amount of the rent I charged the Rovegnos was equal to my monthly mortgage payments and I was going to use the rent money to keep up with those payments.

9.) The Rovegnos paid their rent for about six or seven months. However, by December 2006, they stopped paying rent. Because of the Rovegnos' failure to make their monthly rent payments, I had to start paying the my mortgage payments out of my own pocket.

10.) In late 2006 or early 2007, because of a decline in the mortgage business my daughter and son-in-law decided against moving to New York. This changed my plans as well – I was only moving to be close to my family. Since I decided to remain at my home in Arkansas, I really didn't need the Property anymore. Also, since the Rovegnos stopped making their monthly payments around the same time, I looked into selling the Property. We told the Rovegnos that we were going to sell the Property, and I listed the Property for sale.

11.) In the beginning of March 2007, the Rovegnos were told they would have to move, but before I could evict them for failing to keep up with their monthly rent, the Property was destroyed in a fire. The interior of the home was gutted and beyond repair.

12.) After the fire, Mr. Metheny contacted my home owner's insurance carrier for me. This is when I found out the Rovegnos were trying to untruthfully claim I was related to them, so they could get insurance coverage for their belongings under *my* home owner's insurance policy. Mr. Metheny worked to show the claim was false. Mrs. Rovegno even called me and tried to convince me to lie to the insurance company, and say we were related. I refused to do so because I knew it was wrong and didn't want to get in any trouble. A letter was sent to

3

the insurance company for me saying the Rovegnos' claim was untrue (copy attached as Exhibit D).

13.) When I tried making my claim under the home owner's insurance policy, I was first told that I had no insurable interest in the property because Acranet had apparently never filed the deed and mortgages with Rockland County for recording like they should have. Because of this, the insurance company said they would not pay until we could prove there was an insurable interest. Finally, after a lot of negotiating, we reached a settlement with the insurance company and I received a payment which was used to pay off the 2nd mortgage on the Property.

14.) Some time after the fire, I tried to sell the Property again, and even had someone interested in buying it. Trying to make the sale, I found out that I did not have good title to the Property because the real estate transaction had never been properly recorded as a result of the gross negligence of Acranet and Lawyers Title.

15.) Among other problems, Acranet, with Lawyers Title, never used two necessary forms (the RP-5217 and TP-584) at the closing. These forms had to have my signature so that I would have good title to the Property, but I never was given them to sign. Making things worse, Acranet apparently "lost" the original mortgages and deed somehow, and in the spring of 2007 tried to have new mortgages and a deed created for recording. I cooperated in this process, but the Rovegnos refused to do so. Because of the problems and delays in the recording of the deed several intervening judgments against the Rovegnos were recorded, totaling in excess of $50,000. This created even more obstacles to me having clear title in the Property.

16.) Acranet and Lawyers Title were deceitful because they never told me about the problems and their negligent errors in recording and filing documents related to my

purchase of the Property. Additionally, even though Acranet and Lawyers Title charged me a premium for the owner's title policy (see Line 1307 at Exhibit E), Acranet and Lawyers Title never issued the owner's title policy I contracted and paid for. They currently still refuse to do so.

17.) Because of all these problems I had no choice but to bring the present lawsuit in order to clear up the obstacles to selling the Property.

18.) A few days after Acranet and Lawyers Title were served with the lawsuit, the original mortgages and deed were somehow found and recorded. However, the RP-5217 form and TP-584 form that were used to make the filing were fraudulent. I never signed the documents, yet my alleged signature appears on the forms (copy of RP-5217 attached as Exhibit F).

19.) Because of this fraudulent filing and improper recording, I am unable to sell the Property. However, I keep to making payments on the Property, even though the cloud on my title has caused me great financial trouble.

20.) The Rovegnos are trying to say Mr. Metheny and I walked away with the insurance money they were owed. The seem to think we filed an insurance claim on their personal property that was destroyed in the fire, and that we kept the money. This is not true. I never filed any kind of insurance claim for their property. Any money I received from the homeowner's insurance policy was for the structure of the Property itself, and it went towards paying off the second mortgage I had on the Property, and some of the costs of this lawsuit.

21.) Because of the problems with my title to the Property, like not being able to sell the Property or get my rightful insurance proceeds, I was unable to pay my obligations as they became due. This has caused financial hardships and damaged my credit.

22.) I have never met the Rovegnos; I spoke to Laura Rovegno only once, when she called to try to convince me to lie about being related to her and Richard Rovegno on a couple of occasions due to late rent payments. I have absolutely no knowledge of or involvement in their agreements with Mr. Metheny. I believe that any claims they may have against Mr. Metheny concerning those issues should be brought in a separate action.

23.) In their Affidavit, the Rovegnos say I refused to provide accounting of where their money went. The Rovegnos never asked me to provide anything like that to them. I know nothing about any agreement the Rovegnos might have had with Mr. Metheny when it came to anything like that.

24.) The Rovegnos also tried to say that I was involved in the mortgage business. This is not accurate. It is true that awhile back I started a company with my daughter called New Beginnings Mortgage. The reason was that my daughter was teaching at a school far away from home. I figured that if we started up something closer like this she could work out of home. I really didn't know much of what went on with the company. My daughter handled most of everything with Mr. Metheny. I really had nothing to do with it. We did away with the company sometime around 2005.

25.) The Rovegnos have accused me of participating in fraud with Mr. Metheney to take their money. This is completely untrue. The only money I ever got from the Rovegnos were rental payments due under the Lease Agreement, and I didn't even get all of that.

26.) Based on the foregoing, I assert that my legal claims, which are intended to clear the cloud on my title and seek damages for the losses I have incurred as a result of the actions and inactions of defendants Acranet and Lawyers Title should not be further obstructed by allowing the Rovegnos back into the current action after a default judgment was entered

against them, and to allow them to assert false claims against me that will only prolong and increase this litigation and cause me additional prejudice and financial hardships.

**WHEREFORE**, your deponent respectfully requests that RICHARD AND LAURA ROVEGNO'S motion be, in all respects, denied.

_____
BENNIE WILLIS

Sworn to before me this
_11th_ day of June 2008

_____
Notary Public
Comm. Exp
6-16-2014

