UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
BENNIE WILLIS,

                        Plaintiff,                    07-CV-3646 (SCR)

- against -

LANDAMERICA ONESTOP, INC., d/b/a
LAWYERS TITLE SERVICES COMPANY INC.,     **AFFIDAVIT IN OPPOSITION**
and/or LAWYERS TITLE INSURANCE              **TO MOTION TO VACATE**
CORPORATION, ACRANET MORTGAGE               **PARTIAL DEFAULT**
SETTLEMENT SOLUTIONS, LLC, d/b/a                 **JUDGMENT**
ACRANET LENDSERV, RICHARD ROVEGNO
and LAURA ROVEGNO,

                       Defendants.
-------------------------------------------------------X

STATE OF NEW ARKANSAS)
                       ) ss:
COUNTY OF HARRISON  )

Terry Metheny, being duly sworn, deposes and says:

1. I am over the age of eighteen, suffer no legal disabilities, have personal knowledge of the facts set forth below, and am competent to testify.

2. I am the son-in law of plaintiff Bennie Willis.

3. I have been in the mortgage business for 6 years and I am presently a self-employed Branch Manager of Premium Capital Funding LLC DBA TopDot Mortgage since April 2006.

4. On or about March 1st 2006, I received a call from Richard Rovegno. Upon information and belief, he obtained my phone number from Mr. Alex Fender at FH Financial Services.

5. I agreed to help the Rovegnos attempt to refinance their home (*see* "Loan Proposal Sheet" Exhibit A, "Loan Submission Sheet" Exhibit B, "Uniform Residential Loan Application" Exhibit C, "Good Faith Estimate" Exhibit D) and this would help them with debt restructuring. Unfortunately, my attempts were unsuccessful.

6. On or about March 27th 2006, the refinance was rejected due to the appraisal coming in at $500,000 versus the $550,000 that it needed to.

7. Towards the end of April 2006, I contacted the Rovegnos to learn if they had sold their home yet. They had not. I told the Rovegnos my father-in-law, Bennie Willis, would be willing to buy their house. We negotiated for Mr. Willis to purchase the Rovegno's house outright at a price of $434,000.00, and the parties entered into the Purchase Agreement (*see* Exhibit E).

8. There was no discussion of and no agreement to option the house back to the Rovegnos at a later time. Mr. Willis was in no way a party to, nor was he even aware of my role to restructure the debt of the Rovegnos through my company Clear Conscience LLC.

9. After the Purchase Agreement was entered into, Mr. Rovegno asked me if I could help them re-negotiate their debt. I agreed to do so free of charge. In order to do this we agreed that the equity from the sale of their home would be paid to my company Clear Conscience LLC after the closing and all available funds would be used to satisfy the Rovegnos' debt to the extent the funds were sufficient to satisfy their debt.

10. The first time the Rovegnos asked about the possibility of being able to rent the house back was the day before the closing. However, after the closing Mr. Rovegno claimed that they could not find a place to live. It was decided that the Rovegnos would be

allowed to rent the Property, through a written lease agreement, on a month to month basis.

11. The Lease Agreement that was entered into between Mr. Willis and the Rovegnos is the one attached to the Rovegno Afffidavit at Exhibit D. I have never before seen the so-called "Residential Lease Purchase Option Agreement" attached as Exhibit A to the Rovegno Affidavit.

12. The email attached as Exhibit B to the Rovegno Affidavit has been modified. In the actual email I sent, I explained what Mr. Willis' payments were and told them escrow was not included in that payment. The amount on the email is not the amount that I stated. The last sentence of that email was changed as I told them to make copies of their payments so it would be easier for them to get financing in the future with proof of payments.

13. In a separate phone conversation I explained to Mr. Rovegno that they would need to purchase a renter's insurance policy so that in case of fire, their belongings would be covered.

14. I received $90,211.52 on behalf of the Rovegnos which was wired into my account. However, this was done at the Rovegnos' request. The purpose of the wire was to satisfy their debts to the extent the funds were sufficient. The Rovegnos attached a copy of the agreement they signed and sent it to Acranet, authorizing this transfer (*see* Exhibit F). On two different occasions the Rovegnos requested and I sent them a complete breakdown of the payments that were made on their behalf, along with monies that were sent directly to them upon request, which I did.

15. On or about March 9, 2007, Mr. Rovegno called to tell me of the fire. I asked him if he had gotten renter's insurance like I suggested previously and he said he did not because he couldn't afford it. He then asked me if I could arrange for Mr. Willis to file a claim on their contents as well as the structure, in essence asking Mr. Willis to pretend it was Mr. Willis's contents. After discussing the matter with Mr. Willis, I called Mr. Rovegno and told him we would not file their belongings under Mr. Willis' claim, as it would be insurance fraud.

16. Mr. Rovegno then called me back with a relative of his named "Lou" also on the line. "Lou," who claimed to be a demolition expert suggested that we claim the Rovegno's were related to us, and we were just letting them live in the house. Under this scenario, "Lou" believed their stuff would be covered under Mr. Willis' insurance policy as the policy likely covered relatives' items. Again I told them we would not file their belongings under Mr. Willis' insurance as if they were relatives, given that it would be fraud. Mr. Rovegno was very upset and threatened that he would make us pay for not complying.

17. At no point did I or Mr. Willis, take any of their money for our own benefit. They paid only the exact amount of the combined mortgage payments as rent.

18. Although the Rovegnos claim they never received an accounting of their money, this statement is untrue as well given that I had sent them a breakdown of their funds on two different occasions.

_____
Terry Metheny

Sworn to before me this
11th day of June 2008

_____
Notary Public

"OFFICIAL SEAL"
JANIE M. ROBINSON
Notary Public, State of Arkansas
County of Benton
My Commission Exp. 08/27/2008